DUNHAM & BOOL *against* THE COMMERCIAL INSURANCE COMPANY OF NEW-YORK.

THIS was an action on a policy of insurance, on the ship *Orbit*, valued at 25,000 dollars, subscribed by the defendants for 12,500 dollars, " at and from *New-York* to *Liverpool*, and at and from thence back to a port of discharge in the *United States*." The cause was tried at the *New-York* sittings, in *June*, 1813, before Mr. Justice *Van Ness*, when a verdict was taken for the plaintiffs, by consent, for 4,000 dollars, subject to the opinion of the court, on the following case :

The *Orbit* sailed from *New-York* for *Liverpool* the 23d of *September*, 1810, and during her voyage met with very severe gales of wind and heavy seas, which occasioned considerable damage ; and on the 31st of *October* she experienced a violent storm, which she attempted to ride out at *anchor*, but it became necessary to cut her cables and run her ashore in *Hoylake ;* she was afterwards lightened and got up to *Liverpool* on the 7th of *November*. On the 12th of the same month, she began to discharge her cargo ; and on the 25th of *November* completed its discharge, excepting 380 barrels of turpentine, which, with the leave of the owners, was retained on board as ballast, until the vessel should go into dry dock ; but all the turpentine was landed by the 1st of *December*, having been sold and demanded by the owners. The only places for repairing vessels at *Liverpool*, are in dry docks, and if they are previously occupied, vessels wanting repairs, must wait until there is a vacancy, and the regular turn of the ship arrives. When the *Orbit* arrived at *Liverpool*, on the 7th of *November*, all the dry docks were occupied by other vessels, and there was no opportunity to go into dock to be repaired, until the 20th of *February*, 1811, when she was put in dock, and her repairs completed by the 24th *March* following. The *Orbit* was a *new* ship when she left *New-York ;* the voyage insured being her *first* voyage, and never having before earned freight.

The ship was coppered while in dock, which took up about three days, but she was not detained in dock on that account, as, by reason of the tides, she could not have got out sooner

A ship was insured "at and from *New-York* to *Liverpool*, and at and from thence back to *New-York*." On her outward voyage she sustained so much damage by tempests, &c. that on her arrival at *L.* she was obliged to go into dock to be repaired, which detained her from the 1st of *December* 1810, to the 24th of *March*, 1811. The cargo having been delivered, and freight earned before the 1st of *December*, it was held that the wages of the master and crew and provisions on board were not general average, nor were the underwriters on the ship liable for them.

In estimating the amount of loss in case of repairs, the insured are entitled to a deduction of one third new for old, without any distinction as to the age of the vessel, or whether she was new and on her first voyage or not.

than she did. While she was in *Liverpool*, and repairing, her crew were employed on board of her, in repairing the rigging, and in pumping her to keep her free of water, whenever required by the dockmaster, which was very frequently.

The crew did not eat on board while the ship was repairing, it being contrary to the law at *Liverpool* to have a fire on board of any vessel in port. By an agreement between the master and owners, he was to be allowed one dollar per day, in addition to his wages, while in a foreign port. It appeared to be the invariable practice in *New-York*, in adjusting losses arising from repairs, to deduct one *third* new for old, without reference to the circumstance of the vessel being *new*, or the voyage in which the loss happened being her *first* voyage.

The plaintiffs read in evidence the depositions of several insurance brokers in *Liverpool*, who stated it to be the established law and usage in *England*, in making up the amount of a partial loss on vessels, in cases of repairs, to deduct one third new for old; *except* in cases where the vessel is *new*, and the vessel is on her *first* voyage, at the time the injury is received, in which case no such deduction was made, and that a vessel is not considered as having completed her voyage before she enters the docks at *Liverpool;* and that it was not the custom of merchants in *Liverpool* to charge to the underwriters the wages and provisions of the master and crew, while the ship is waiting to go into dock to repair, or during the time she is repairing.

The plaintiffs also exhibited in evidence, the accounts of expenses and disbursements from the time the accident happened until the vessel left *Liverpool*, on her return home; and also an account of the wages of the master and crew from the 24th of *November*, 1810, when the cargo was discharged, to the 24th of *March*, 1811, when the repairs were completed and she came out of dock.

The counsel for the defendants admitted the correctness of the items in the accounts, as claimed, except the following, which he objected to, as not properly chargeable to the defendants, viz.

1. *Board* of master and crew from December 1, 1810,
   to the 24th of March, 1811.                    Dol. 451 22
2. Wages of master, mates, and crew, for the same time, 444 25
3. Compensation of one dollar per day, allowed the master, 57

4. And they claimed a deduction of 776 dollars and 63 cents, being *one third* new for old, on the amount of repairs.

ALBANY,
August, 1814.

DUNHAM
v.
Com. Ins. Co.

*Colden,* for the plaintiffs. 1. The wages and provisions of the master and crew are general average where a vessel, from necessity, puts into an intermediate port, for repairs.* I can see no reason why the insurers should not be equally liable, where the vessel happens to be in the port of delivery, as long as she is covered by the policy. There can be no *general average* in this case, because the expense did not contribute to the safety of the cargo or freight, the cargo having been delivered and the freight earned. It must, therefore, be a particular average or partial loss on the ship.

* *Walden* v. *Le Roy,* 2 *Caines' Rep.* 263.

It is true, Lord *Mansfield,* in *Fletcher* v. *Poole,*† said that wages and provisions expended while a ship was detained for repairs, could never be allowed as a charge against the insurer on *the ship* ; but in *Eateward* v. *Carling,*‡ his lordship qualifies his general expression, and says there may be cases where exceptions to the general rule are allowable, as where the expense is absolutely necessary, and such as could not be avoided, owing to some of the perils stated in the policy. This doctrine is laid down by *Beawes,*§ and was recognised by *Buller,* J. in *Decosta* v. *Newnham,*‖ in which the whole court were of opinion, that wages and provisions of workmen, hired for such repairs, were general average.

† *Park on Ins.* 70.

‡ *Park,* 174.

§ *Beawes' Lex Merc.* 150.
‖ *2 Term Rep.* 407.

2. The allowance of one third new for old, has been permitted as a general rule, so that the insured may recover his indemnity, and no more; but where the vessel is perfectly new, and on her first voyage, to apply the rule would be manifestly unjust, for the insured would not be indemnified. The establishd usage in *England,* on this subject, is equitable and fair, and ought to be adopted here.

*Wells,* contra. 1. We admit the usage in *England* to be as proved; but we answer, that a different usage has been established here. No such distinction is made as to the vessel being new, and on her first voyage. Why is usage resorted to? Because the usage of the place where the contract is made is supposed to have entered into the consideration of the parties at the time. Why resort to the usage of a foreign country, when

we have a usage here, where the contract was made, and where it is to be carried into effect?

Suppose the vessel had gone into a foreign port where no such allowance at all was made, in any case, would that be permitted to govern here, instead of our own usage? [Here he was stopped by the court, on this point.]

2. It has been well settled in *England,* that on a policy on the ship, wages and provisions, during an embargo or detention, are not chargeable against the underwriters.* Though they are a consequence of the peril insured against, they are not the direct and necessary consequence, but are incidental. Adverse winds, storms, and tempests, are perils insured against in the policy; but though the ship may be detained, or her voyage retarded, by such perils, yet the insurers are not answerable for the additional expenses of wages and provisions for the crew. The court look at the subject of the insurance, which is the ship, not the wages and provisions. The insurance is on the body of the ship, tackle, and furniture, not on the voyage or crew.(*a*) The same doctrine is laid down by Lord *Mansfield,* in *Fletcher* v. *Poole,*† and *Eden* v. *Poole.*‡ In *Lateward* v. *Curling,* Lord *Mansfield* clearly alludes to the case of *general average,* as that in which the exception he states is applicable. *Park* so understands him, and the passage he cites from *Beawes,* to support Lord *Mansfield's* doctrine, confirms that idea. In *De Costa* v. *Newnham, Buller,* J. alludes to the case of *Lateward* v. *Curling,* and the observation of Lord *Mansfield,* as referring to the case of general average. The doctrine of *Beawes,* however, seems not to have been explicitly adopted by the *English* courts. *Marshall*§ disapproves of it, as contrary to the opinions of the most respectable writers on the subject; and it may be, when the question shall again come fully before the courts in *England,* that the doctrine, even as to *general average,* will not be established as law.

But, in the present case, the plaintiffs attempt to go a step further, and to make wages and provisions, in a case of detention for repairs, a particular average, or special loss on the ship. Similar attempts have been made in *England,* but always without success. "It shall never be permitted to an owner of a ship," says *Park,* "who insures the *ship merely,* to demand sa-

(*a*) But see *Brough* v. *Whitmore.* (4 *Term Rep.* 205.) *Park,* 73, 74, 77.

tisfaction for the loss of merchandise laden therein, or to ask from the insurers extraordinary wages paid to the seamen, or the value of provisions consumed, by reason of the detention of the ship at any port longer than was expected." " Such attempts have, indeed, been made, but they have always been resisted: for to admit of such demands would introduce an infinite variety of frauds, and be repugnant to the most settled maxims of insurance law, and to the constant practice and usage of trade."

It is true, that this court, in *Leavenworth* v. *Delafield,*[*] and *Walden* v. *Le Roy,*[†] have adopted the doctrine from *Beawes,*(a) making wages and provisions, at a port of necessity, *general average,* but that is the utmost length to which the court have gone. The detention here is not at a port of necessity, but in the port of destination or delivery. If *commercial usage* is resorted to, it is directly against the allowance of such a claim in *England.*

In *Watson* v. *The Marine Insurance Company,*[‡] an allowance *per diem* to the captain, by agreement, while in port, beyond his wages, was not permitted to be brought into the account of general average.

*Emmet,* in reply, said the usage, in *England,* not to deduct one third new for old, when the ship was new, and on her *first* voyage, was fully proved. *Wesket*[§] speaks of the usage as if it was established. " One third," he says, " is deducted from the repairs of a ship, if she has met with any accident, only in her *second* voyage, when it is a great deal *too much ;* and, therefore, it must be adhered to at other times, when it is *too little.*" There can be no doubt of the usage in *England.* Ought, then, a local usage in this state, introduced we know not how, and never adjudicated upon by any court, prevail against the established commercial usage of *England,* whose laws we have adopted ? Especially, when that usage is founded on principles of acknowledged equity and justice. If the usage set up here was sanctioned by superior equity, it might justify a departure from the *English* rule ; but it is obviously inequitable. Indeed,

(a) See also *Barker* v. *The Phœnix Insurance Company.* (8 *Johns. Rep.* 307.) *Sharp* v. *Gladstone.* (7 *East,* 24.) *Emerig.* tom. 1. p. 624, 625. 631. *Newnham* v. *Cazalet. Park,* 366. *note. Abbot on Ships,* 335, 336. part 3. c. 5. s. 8, 9, 10. *Ricard, Negoce d'Amsterdam,* p. 279, 280.

ALBANY,
August, 1814.

DUNHAM
v.
COM. INS. Co.

[*]1 *Caines' Rep.*
573.
[†]2 *Caines' Rep.*
262.

[‡]7 *Johns. Rep.*
58.

[§] *Wesket on Ins.*
(*Repairs.*) 456.

ALBANY,
August, 1814.

DUNHAM
v.
COM. INS. Co.

in the case of a new vessel, it would be more just to add one third than to deduct it. *Wesket* considers the deduction of one third, even in the second voyage, as a great deal too much.

2. *Liverpool* was not the final port of delivery. The insurance was at and from *New-York* to *Liverpool*, and at and from *Liverpool* back to *New-York*. The port of destination or delivery is *New-York*, where the voyage was to end. *Liverpool* was an intermediate port, and, in consequence of the perils insured against, the repairs were absolutely necessary to enable the ship to prosecute the voyage insured to its termination. Accident made *Liverpool* a port of necessity, for the ship was necessarily detained there, in her *iter* or voyage. While the cargo was unlading, it was a port of delivery, but in the intermediate time, it was a port of necessity. Had there been other subjects to contribute, it would have been a clear case of general average; but as there was no cargo, and the freight was earned, the whole expense of repairs must necessarily fall on the ship. It is not a particular average, or loss on the ship, but a general average, which, by peculiar circumstances, is necessarily to be paid wholly by the ship, as the only existing subject which can contribute. But, even as a particular average, the expenses ought to be borne by the ship; the repairs were for her benefit, and essentially necessary.

Again, these charges are not properly wages and provisions of seamen, doing duty as seamen, but of seamen, doing duty as *workmen* and *labourers*.

* 4 Term Rep.
206.
† Marsh on Ins.
725. and note.

In *Brough* v. *Whitmore*,* provisions were deemed part of the ship's furniture; and *Marshall*† criticises the cases of *Robertson* v. *Ewer*, *Fletcher* v. *Poole*, and *Eden* v. *Poole*, to show that they were not reconcilable with that case.

THOMPSON, Ch. J. delivered the opinion of the court. This was an insurance upon the ship *Orbit*, at and from *New-York* to *Liverpool*, and at and from thence to a port of discharge in the *United States*. On the outward voyage the ship sustained considerable injury, so that, after having arrived and discharged her cargo at *Liverpool*, she was obliged to go into dock to repair, and was detained for that purpose from the 1st of *December*, 1810, to the 24th of *March*, 1811; and the questions which arise in the case are, whether the underwriters are chargeable with the wages and provisions of the master and crew, during this

time, and, also, whether the underwriters are entitled to a de- <span>ALBANY,</span>
duction of one third new for old on the repairs of the ship, this <span>August, 181.4.</span>
being her first voyage.

<span>DUNHAM
v.
COM. INS. Co.</span>

In the case of *Leavenworth* v. *Delafield*, (1 *Caines' Rep.* 573.)
wages and provisions, during the detention of a vessel *captured*
and carried in for adjudication, were considered proper ex-
penses to be brought into general average; and in the case of
*Walden* v. *Leroy*, (2 *Caines' Rep.* 263.) the principle was ex-
tended to expenses incurred for wages and provisions during
the detention of the vessel for repairs. But in these cases the
expenses were incurred before the vessel had arrived at her port
of discharge, and were necessary for the prosecution of the
voyage; they were, therefore, incurred as well for the benefit
of the cargo and freight, as for the vessel; and expenses only
of this description can properly be brought into a general ave-
rage. Each subject is bound to contribute, because it derives
a benefit from the expenditure. A loss which does not conduce
to the preservation of ship and cargo, is not a proper ground
for an average contribution, according to the rule as laid down
by *Marshall*, (560. 562.) and which is recognised and sanctioned
by all the cases on the subject. According to this rule, it is
clear that the expenses for wages and provisions during the
time the ship was detained at *Liverpool*, cannot be brought into
general average. They were not incurred for the benefit of car-
go or freight. The cargo had arrived at its port of discharge,
and had been delivered, and freight earned, before the expenses
in question were incurred; and if these expenses cannot be
brought into general average, I do not see how the underwriters
on the ship are to be made liable for them. No case was cited
on the argument, nor is there any, I believe, to be found in the
books to warrant such a charge. The insurance is upon the
ship, tackle, and furniture; and the wages and provisions of the
crew are no part of the thing insured. The court only look
to the thing itself, which is the subject of insurance. (1 *Term
Rep.* 132.)

The underwriters are entitled to a deduction of one third
new for old. We have never recognised any rule making a
distinction as to the age of the vessel; and admitting such a
custom to exist at *Liverpool*, it cannot be presumed to have

been in the contemplation of the parties when they entered into this contract, for it could not have been known that any repairs would be necessary. The proof of a custom is admissible for the purpose of explaining the probable intention of the parties, and it is more reasonable to suppose the parties had in view our own rule on this subject, than that of any other place. The rule ought to be general and uniform. The repairs might have been in a port where a different custom prevailed. If, therefore, we were to be governed by the custom of the foreign port where the repairs are made, the rule might be continually fluctuating. It is in this, as in many other cases, of more importance to have a settled rule on the subject, than what the rule itself may be.

The account, therefore, between the parties must be settled on the principles here laid down; rejecting the claim for wages and provisions at *Liverpool*, between the 1st of *December*, 1810, and the 24th of *March* following, and allowing to the underwriters a deduction of one third new for old on the repairs.

Judgment for the plaintiffs accordingly.