### WHEELER *v.* CONTINENTAL INS. CO.

(*Supreme Court, General Term, Fourth Department.*   February 11, 1890.)

1. SHIPPING—AVERAGE BONDS—ACTIONS.
   In an action on a general average bond, given by defendant on the partial wreck of a vessel containing a cargo which it had insured, and part of which had been jettisoned, the court has no authority to assume that the pay of one tug for ordinary service would be the same as the pay of another tug for wrecking service.

2. SAME—EXPENSES.
   The expenses incurred after the cargo was substantially all delivered, but before the vessel was in a place of safety, are properly allowed in general average; the community of interest between the vessel and cargo not ceasing until the vessel was in a place of safety.

3. SAME—PAYMENT TO SALVORS—INTEREST.
   Plaintiff, having settled the bills of the salvors, is properly allowed interest from the time of their payment.

Appeal from judgment on report of a referee.

Action by Margaret Wheeler against the Continental Insurance Company upon a general average bond.   On the 28th November, 1885, the plaintiff was the owner of the schooner Bolivia, then lying at the port of Toledo, Ohio.   At that date there was shipped on board of that vessel, for the purpose of transportation to Ogdensburgh, N. Y., 25,000 bushels of corn, which was insured for the sum of $11,250.   Of this insurance $5,000 was taken by the defendant.   The schooner left Toledo on the 29th November, 1885, and proceeded in safety until the 7th December, 1885, when, at a point about four and a half miles below Kingston, she struck a shoal in the St. Lawrence river, and was injured, so that she partially sank.   The vessel and cargo were greatly dam-

aged; and in danger of being wholly lost.  The master thereupon employed a steamer, the "Chieftain," and a lighter, with crews and steam-pumps, to lighten and raise the schooner.  This was done, and the schooner towed to Ogdensburgh, where she arrived on the night of December 11th.  In order to raise and save the schooner and cargo, a portion of the cargo (about 8,000 bushels) was jettisoned.  At Ogdensburgh the cargo was abandoned to the underwriters, and, after some days delay by reason of controversy between the interested parties over the loss, a general average bond was given on the 15th December, 1885, bearing date December 12th.  The cargo was then delivered and sold, and the vessel was also afterwards sold.  There was a judgment for plaintiff for $754, and costs.  Defendant appeals.

Argued before HARDIN, P. J., and MARTIN and MERWIN, JJ.

Clinton & Clark, for appellant.  W. A. Poucher, for respondent.

MERWIN, J.  The claim of the defendant is that the referee, in stating the account upon which he based his adjustment of the loss, erred in several particulars.

1. The master of the Bolivia, upon her arrival at Kingston, employed a steam-tug called the "Proctor" to tow the schooner to its port of destination.  Under what arrangement, or for what price, the tug was employed, does not appear, and the referee finds that he cannot state or find it, as the evidence is silent on the subject.  At the time of the accident the schooner was in tow of the tug.  The defendant claims that the referee erred in not deducting from the bill of the Chieftain an amount equivalent to the towing bill of the Proctor, and thus reducing the general average charges.  There is evidence to the effect that, where it is usual for a vessel to tow, then a reduction should be made.  It is not shown that in the present case the towing was customary.  The towing bill of the Proctor was not proved, but the defendant claims that an equitable amount can be ascertained by assuming that the pay of the Proctor was at the same rate as the Chieftain, and calculating for the time it would have taken to have gone from the place of the disaster to Ogdensburgh.  I think we have no right to assume that the pay of one tug for ordinary service would be the same as the pay of another tug or steamer for wrecking service and the towing of disabled craft.  No request was made for findings on this subject.  The case shows that the counsel for the plaintiff, just before resting his case, inquired of the defendant's counsel if he wanted "any further proof in regard to the bills."  This referred to the bill of the Chieftain, with others.  The counsel for the defendant replied that if they wanted any further proof he would point it out specifically, so it could be proved at any time.  No such specification was afterwards made as to this account or claim.  It is too late now to say that the proof of the plaintiff was defective on the subject.  The bill of the Chieftain, as proved, was $1,138.25.  The referee in fact allowed it at $1,100, as that was the amount the plaintiff paid.  No reason for any further deduction is apparent.

2. It is further claimed that the referee erred in fixing the contributory value of the freight.  The freight on the amount of grain delivered, which was 17,000 bushels, was $1,020, although but $926.50 seems to have been paid.  The freight on the 8,000 bushels jettisoned being $480, was contributed for, making the total freight $1,500.  The contributory value was placed by the referee at one-half the amount.  This was in accordance with the expert evidence on both sides.  An adjuster, agreed upon by both sides, fixed it in this way, and no objection was taken in that regard to his adjustment.  No objection appears to have been made to this on the trial.  The claim now is that the freight contributed for should have been placed in the list at its full amount.  It is conceded that the freight earned should contribute for only half the amount, that being deemed to be net freight; but it is claimed a different rule applies to the freight contributed for.  There is a statement to this effect in

Dix. Ins. 148. The extent to which freight shall contribute is a matter depending on usage. 1 Pars. Shipp. & Adm. 431. According to the evidence in this case, the custom of taking one-half as the contributory value extends to the freight contributed for as well as to that earned. The action of the referee on the subject should not, under the circumstances, be disturbed. Nor does the defendant make clear its claim that the freight contributed for should be reduced by some sum which the vessel would have been obliged to pay for shoveling and elevating the jettisoned grain. The evidence on the subject is conflicting. The facts on the subject are not found, and there were no requests to find. There are cases in which this has been held to be necessary. *Lyons* v. *Cahill*, 55 N. Y. Super. Ct. 553; *Graff* v. *Ross*, 47 Hun, 152.

3. The referee allowed in general average expenses certain items incurred after the cargo was substantially all delivered, but before the vessel was in a place of safety. This the defendant claims was improper, on the theory that expenses incurred in regard to the vessel after the cargo was delivered at the port of destination should be charged entirely to the vessel, and not go into general average. The unloading of the wet grain in the Bolivia commenced on the 15th December, at the Lake Champlain warehouse, in the port of Ogdensburgh, and was substantially completed in the night of the 18th December. During the unloading the steam-pumps were in operation to keep the schooner afloat. When the cargo was substantially all out, the vessel, in consequence of being top-heavy, and of the weight of the steam-pumps, and the extra weight of the ice on her, careened towards the dock, rolled over, and sunk along-side the dock. Certain expenses were then incurred to right the vessel, and pump the water out, and tow her a short distance to the dry dock, and place her there in a place of safety. The objection to the allowance of these expenses in general average is not a good one. The vessel was kept at the dock in a place not safe for her, but for the benefit of the cargo, and its delivery. It will not do for the owners of the cargo to say, "We have now our grain, and the vessel may go to the bottom or save herself, at her own expense." This is not like the case of *Dunham* v. *Insurance Co.*, 11 Johns. 315. There the expenses were after the ship was taken into dock for repair. Nor is it a case of accidental stranding, and the cases on that subject do not apply. It was rather a part of the wrecking enterprise, that was not completed until the vessel was at the dry dock. The steam-pumps were on board, and were in use, and their safety was to be provided for. The value of the vessel, as thus preserved, becomes one of the contributing values in which the defendant claimed and has an interest. The referee correctly held that the community of interest between the vessel and cargo did not cease until the vessel was in a place of safety at the dry dock. The expenses at Ogdensburgh were largely increased by the delay in proceeding to unload. This delay the defendant is not in a position to charge to the plaintiff. The bills of the salvors were incurred in good faith by the master, and were fully proved. They amounted to $4,297.86. When these bills were settled by the plaintiff, the parties made deductions for her benefit to the amount of $658.25. The referee gives the benefit of these deductions to all the parties in interest. In the referee's adjustment, as a whole, the defendant has no ground of complaint.

4. The referee allowed interest from the time of the payment of the bills by the plaintiff. This was correct. *Sims* v. *Willing*, 8 Serg. & R. 102; *Vandenheuvel* v. *Insurance Co.*, 1 Johns. 406, 413. In substance, it was a case of money advanced for defendant's use, and interest was recoverable from the time of the advance. *Gillet* v. *Van Rensselaer*, 15 N. Y. 399. As said in the *Sims Case*, there is no reason for referring the calculation of interest to the period when the average was adjusted; the adjustment forms no part of the plaintiff's title. The giving of the average bond does not affect the question. It follows that the judgment is correct, and should be affirmed. Judgment affirmed, with costs. All concur.