By the Court. Duer, J.
This is a very plain case. If we follow the established, and hitherto undoubted, construction of the policy, we are bound to say that it covers none of the losses for which an indemnity is now claimed, and that the learned judge who tried the cause would have committed a grave error had he refused to nonsuit the plaintiffs.
That the losses claimed cannot be referred to any of the particular risks which the policy enumerates is exceedingly clear, for the supposition, that they may be imputed to the barratry of the master and crew, we reject, as manifestly groundless. There is not the slightest proof of the embezzlement charged in the complaint, and it would be monstrous to say that the master was guilty of barratry in not withholding from the passengers the necessary means of preserving their lives. The barratry of the master is, according to the definition of Lord Ellen-borough in Earle v. Rowcroft (8 East. 139), a criminal breach of his duty towards his owners; and to apply the term criminal to the conduct of the master, in the case before us, would be an abuse of language and a perversion of truth. The consumption of the provisions of the assured by the passengers was a physical necessity: the permission of such use by the master a high moral obligation, and so far from being liable to censure, he would have been deeply culpable had he acted otherwise than he did. So, upon similar grounds, he was entirely justified in selling a portion of the goods at Eio de Janeiro. The sale was made to enable him to pay for supplies and stores that were indispensable to the further prosecution of the voyage. He was without funds or credit, and a sale of a part of the cargo was his only resource. Under these circumstances, to make the sale was not only a right, but a duty.
If the losses, then, as they appear in the evidence, are reco *170 verable at all, they can only be so under the general clause, which follows in the policy the enumeration, of particular risks, and accordingly it was upon the construction that he urged us to give to the words of this clause that the learned counsel for the plaintiffs laid the stress of his argument. He insisted that they comprehend every loss, direct or consequential, that can possibly happen to the-subject insured, no matter from what cause, or by whose act, in port as well" as at sea, from the commencement until the termination of the voyage covered by the -policy.
Hor can it be denied, that if the words of the clause are separately considered, such is their obvious and, indeed, necessary construction. It is a construction, however, so directly opposed to that which courts of justice have hitherto followed, that it is scarcely possible to imagine a more radical and extensive change in the law of marine insurance than its adoption would effect. It is so far from being true that the liability of the underwriters is subject to no limitation, that there are numerous classes of losses from which, according to all the decisions and the text writers, they are wholly exeiqpt, although the words of the general clause, as construed by the counsel for the plaintiffs, certainly embrace them.
In determining the liability of the underwriters, no distinction is more fully established, or more frequently applied, than that between ordinary and extraordinary perils and losses. It is elementary. It is only for the latter description of losses that the insurer is liable. In the language of Mr. Justice Thompson in Barnewell v. Church, 1 Caines. 234, “ he undertakes only to indemnify against the extraordinary and unforeseen perils to which every ship is exposed in the course of the voyage.” Although to discriminate between ordinary and extraordinary losses is, in some cases, a matter of great nicety and difficulty, yet the cases are numerous in which the discrimination has been made, and has operated to defeat the claims of the assured.
Thus, if the masts and spars of the ship are damaged, or her sails torn or carried away, and even when in the course of the voyage she springs a leak, unless, in each case, the loss can be distinctly traced to the immediate and violent operation of a *171 peril of the sea, it is considered as resulting from the ordinary wear and tear of the voyage, and the expense of repairing it is never a charge upon the underwriter (1 Emerigon, 390; Pothier, n. 66; 3 Kent’s Comm. 300; 1 Phillips, 625-6; 2 Arnould, 756-7 ; Benecke on Indemnity (Eng. ed.) 454-5-6).
There is another large class of losses, of very frequent occurrence, for which the law is settled, that the underwriter is not responsible. He is responsible only when the loss is occasioned by the operation of a cause, acting externally upon the subject insured; never when it arises solely from an internal and inherent principle of decay or corruption. Thus he is not responsible if fruit becomes rotten, or flour heated, or wine turns sour merely from internal decomposition, nor even when the property is destroyed by a spontaneous combustion arising from its own nature or accidental condition when laden (1 Phillips, 627-8; 2 Arnould, 756, § 282; 1 Emerigon, § 9: “ Du vice propre de la chose” pp. 388-392; Boyd v. Dubois, 3 Camp. 133).
So when there is no insurance against barratry eo nonrnie, it appears to be clearly settled that the underwriter is not liable for losses occasioned by the barratrous acts of the master or crew, such as the wilful violation of a blockade, or an unlawful resistance to a search (Harratt v. Wise, 9 B. & C. 712; Robinson v. Jones, 8 Mass. 536; 9 Cranch, 63; 1 Emerigon, 484; 1 Phillips, 589, 592). It has never been supposed or intimated that such losses are covered by the general clause in the policy. And even when barratry is an enumerated risk, the underwriter is not liable for a loss directly attributable to the negligence of the master or crew. It may be admitted that, according to the modern decisions, when a peril insured against is the froximate cause of the loss, it is no defence to the underwriter that the peril was itself occasioned by the negligence of the master or crew (2 Arnould, 767-769, and cases there collected). But these decisions, difficult as it maybe to reconcile them with former cases, have certainly not altered the law, when the negligence, and not an intervening peril, is the immediate cause of the loss (Tanner v. Bennett; Ry. v. Mood. 182; Bradford v. Leoy, 2 C. & P. 137; Bradhust v. Col. Ins. Co. 9 John. *172 17; Potter v. Suffolk Ins. Co. 2 Sumn. 197; 2 Arnould, 772; 1 Phillips, 589, 590).*
It is not necessary to pursue the discussion. It conclusively follows from the observations we have made that the underwriter, by the fixed legal interpretation of his contract, is not bound to make good to the assured all losses, without reference to their character or causes, that may happen to the property insured during the pendency of the risks, and, consequently, that the general words, which, in their literal extent, embrace all such losses, must be understood in a restricted sense. What is the nature of the limitation to which they are subject is the question next to be considered.
Ror, in our judgment, can this be treated by us as an open question. It is settled by many decisions and by the consent of all the text writers of authority. The words of the general clause, broad as they are, in this, as in many analogous cases, are limited in their application by the specification that immediately precedes them, and therefore have their due effect assigned to them by allowing them to comprehend and cover only such other cases of marine damage as are of the like kind (ejusdem generis) with those specially enumerated, and are occasioned by similar causes. It is true that Lord Ellenborough said in the case of Cullen v. Butler (5 M. & Sel. 461), that in the courts of law a judicial construction had not yet been given to the general clause in the policy; but whether that observation was strictly accurate or not, it is certain that, in this very case, the construction which we have given was adopted by the court, and equally so that it has since been uniformly followed (1 Phillips, 2d ed. pp. 688-9; 2 Arnould, pp. 842, 399, 314). They are the very words of Lord Ellenborough that we have used in stating the rule.
That the losses which are now sought to be recovered are of the “ like nature, and were occasioned by similar causes” as *173 those specially enumerated in the policy, was very faintly asserted upon the argument, and we are clear in the opinion that this necessary analogy wholly fails. If it exist, we have heen unable to discover it. The enumerated risks may be divided into two classes. They are either external causes acting with violence directly, or by a necessary consequence, upon the subject insured, or acts of illegality, malversation or fraud; and it seems manifest that to neither class can the losses now claimed be justly, or even, speciously, referred.
But it is not upon this reasoning alone that we rest our decision. As we intimated upon the argument, the exact question has been determined in England, and determined in favor of the underwriter. In the case of Powell v. Gudgeon (5 Maule and Sel. 431), in which it appeared that the master, from his inability to procure funds, had sold a part of the cargo to defray the necessary expenses of repairing the ship, it was held by the Court of King’s Bench that the underwriters were not responsible for the loss sustained by the shipper ; and in the case of Sarquay v. Hobson (4 Bing. 131; S. C. 1 B. & C. 7), this decision was approved and followed by the Court of Common Pleas. It is true that these cases apply in terms only to a part of the loss that is now demanded, but in principle they embrace the whole. Between a necessary sale by the master and a necessary consumption of the cargo by the passengers, we can make no distinction, nor was any attempted to be made by the ingenious counsel for the plaintiffs.
fSTor is this all: the reason for exempting the underwriters from liability, in the present case, are in reality much stronger than in either of those to which we have referred. In each of those cases the sale of cargo was made in a port of distress, and for the purpose of meeting the expenses of repairs, which had been rendered necessary by a peril insured against, and hence it was very plausibly argued that the sale was a necessary consequence of the peril, and that the underwriters were therefore liable for the loss which it occasioned; nor could any reply be made to this argument except that which was given by the court, namely: that the peril, although a remote, was not the proximate cause of the loss. In this case the sale was made— and the distinction is vital—not in a port of distress but of des *174 tination, nor can any peril covered by the policy be assigned as the cause, proximate or remote, of the necessity by which it was justified. The same remarks may'be applied to the consumption of the provisions by the passengers. This consumption, not in itself a peril covered by the policy, was assuredly not the consequence of any other. In both cases the loss is attributable to the same causes—a gross neglect of duty on the part, not of the master, but of the owners of the ship.
It is said by Hr. Arnould, the author of a recent and very able treatise on marine insurance, that the underwriter is discharged from all liability “ where the loss arises from causes which the owners or masters of a ship are bound by their duty as carriers to prevent, or which they might have prevented by a due exercise of reasonable and ordinary vigilance,” and the cases to which he refers fully sustain the doctrine and prove, that in such cases, the masters or ship owners are alone responsible for the loss sustained by a shipper (2 Arnould, 774-5).
We think it would be difficult to state or imagine a case to which this established and equitable doctrine is more strikingly applicable than to the present. It is doubtful, upon the evidence, whether any part of the loss was -sustained before the ship arrived at Rio de Janeiro; if any, it was a small and not distinguishable portion. The entire loss as proved, arose from the sale made by the master at Rio, and from the consumption of the provisions belonging to the assured during the voyage from Rio to Valparaiso and thence to San Francisco. Both Rio and Valparaiso were ports of destination; ports to which the vessel was bound when she left Philadelphia. They are also well known ports of naval equipment and supply, where all the necessary means for the prosecution of the voyage, without resorting at all for any purpose to the goods of the shippers, might readily have been obtained had the master been provided by his owners with the requisite funds or credit. The result is, that it is to the neglect of the owners of the ship to furnish the master with the necessary funds or credit that the entire loss is directly and plainly imputable. This neglect, however, was a manifest breach of the duty of the owners as carriers—of their duty to passengers and shippers. They are just as certainly bound by their contract of transportation to put the ship, in all *175 respects, in a fit condition to prosecute the voyage at each intermediate port of destination as at the original port of departure. The decision of the Court of Errors in the American Insurance Company v. Ogden (20 Wendell, 287), appears to have settled the law in this state, that the ship owner is bound to furnish the master with funds or credit at a port of destination. If such is his duty in respect to the insurer, á fortiori is it in respect to shippers. The obligation of the owners in this case was exactly the same at Rio and at Valparaiso as at Philadelphia. For the loss, resulting from this violation of their duty as carriers, the owners, as in all analogous cases, are alone responsible, and it is against them, not the defendants, that the plaintiffs should have sought their remedy.
It remains to add a few words on the question of seaworthiness. The evidence, we think, was nearly conclusive that the ship was nnseaworthy when she commenced her voyage. She had been at sea only nineteen or twenty days when she became short of water and the passengers and crew were put on allowance, and, as no supervening cause of the failure is shown, it is difficult to attribute it to any other than a deficiency in the original supply (Fontaine v. Phœnix Insurance Company, 10 John. 58). We were told indeed by the learned counsel for the plaintiffs, that the seaworthiness of the ship when the risks commence, is a presumption of law, which can only be repelled by positive evidence on the part of the underwriter. He must prove, even where it appears that the vessel became unseaworthy in the course of the voyage, that she was nnseaworthy when it commencednor can it be said that this position is destitute of authority. It is in a measure sustained by the opinion of Hr. Phillips and by two or more decisions of the. Supreme Court of Massachusetts (1 Phillips, 324; 2 do. 757; Taylor v. Lowell, 3 Mass. 341; Paddock v. Franklin, Insurance Company, 11 Pick. 227).
In the case, however, of Tidmarsh v. Washington Farmers' & Mechanics' Insurance Company, 4 Mason, 446, it was decisively rejected by that consummate master of commercial law, Mr. Justice Story, and for reasons that appear to us not merely satisfactory, but conclusive. The seaworthiness of the vessel when the risks commence is a condition precedent: to the *176 attaching of the policy, and the fulfilment of this condition is the implied warranty of the assured. The general rule cannot be denied that the burden of proving the fulfilment of a condition precedent rests upon the party whose right to maintain his action or defence depends upon its performance, and no reason has been given why this rule is not just as applicable to the implied warranty of seaworthiness as to an express warranty of neutrality. The alleged exception would be purely anomalous.
The true rule deducible from a full comparison of the cases appears to be that which is stated by Hr. Arnould. The assured is bound to aver and prove that the ship was seaworthy when the risks commenced, but .the proof to be given by him, in the first instance, need not be particular and full. Although slight and general, if not contradicted, it is deemed sufficient, and when given, it shifts the burden upon the itnderwriter (2 Arnould, § 447, p. 1345).
Applying this rule to the present case, it would probably not be difficult, upon this ground alone, to sustain the nonsuit, but as some evidence of seaworthiness was given, we will not say that the question might not with propriety have been,submitted to the jury. "W"e prefer to place our decision upon the ground that there was no evidence of any loss against which the defendants, by the just construction of the policy, undertook to indemnify the assured.
The motion for a new trial is therefore denied, and the judgment of nonsuit affirmed with costs.

 That insurers are not liable for losses resulting immediately from the negligence of the master is now settled to be the law, by a recent decision of the Supreme Court of the United States—Vide General Mutual Ins. Co. v. Sherwood, 11 Leg. Observer, p. 129.