April 11th, the Judges delivered their opinion, seriatim.
Bosworth, J.
The Judge before whom this action was tried, found as facts that, the goods insured were damaged while being carried in a flat boat up the Chagres river, by being saturated with water while being transported in said flat boat.
That such water entered and came within said flat boat, by reason of the leaking thereof, during such transportation of the goods. That such damage was not, nor was any part of it, caused by rain or spray.
The conclusion of the Judge, on these facts, in the absence of all evidence of any violent storm, or of any extraordinary peril, or of the encountering of any perils which could have caused the leaking of the flat boats on which the goods were damaged, was, that such flat boats were unseaworthy at the time the said goods were put on board of them. The latter conclusion is stated as a conclusion of law.
Whether the implied warranty of seaworthiness, with the *65 usual consequences, attached to these boats, under the policy in question, is, perhaps, a debatable question.
But whether it did or not, I think, the conclusion stated; that they were actually unseaworthy, was one which followed, as a just legal inference, from the special facts on which it was based.
Arnould states the rule thus: “ Where a ship becomes so leaky or disabled as to be unable, to proceed on her voyage, soon after sailing on it, and this cannot be ascribed to any violent storm, or extraordinary peril of the seas, the fair and natural presumption is, that it arose from causes existing before her setting out on her voyage, and consequently that she was not seaworthy when she sailed. In such cases, therefore, it is incumbent on the assured to show that, at the time of her departure, she was in fact seaworthy, and that her inability has arisen from causes subsequent to the commencement of the voyage.” 1 Arnould, 686, and note 1. The cases there cited support, as I think, this proposition.
Perhaps it would have been more appropriate, to have found as a fact, that the boat was unseaworthy, when the goods were put on board of the boat, and also at the time, when the boat commenced its voyage.
But the special facts, on which this conclusion was founded, are stated. They furnished prima facie evidence of the truth of the conclusion, and cast on the assured the burthen of proving that the boat was seaworthy at the commencement of its voyage.
„ Whether the conclusion be found and stated as one of fact, without stating the special facts on which the general and more comprehensive one of unseaworthiness was based, or as is done here, the special facts are stated, and the presumption which, the law draws from them, be found as a conclusion of law, does not seem to be very material.
The water, in the boat, did not come there from rain or spray. The water, as is found to be the fact, came into the boat from its leaking. One of the packages was seen at Galloon on the Chagres River. It was then in the bottom of the boat half covered with water. That boat carried the goods some forty or fifty miles. All of these goods, according to the evidence, must have lain in the water a long time, to have been reduced to the condition, in which they were found to be, on reaching San Francisco.
It is, probably, a fair inference that there was great inattention *66 on the part of the boatmen to the condition of the goods, while in their charge, and that but little if any thing was done, in the way of bailing the boat, to obviate the consequences,, to the goods, of its leaking.
It would seem that the goods, instead of being damaged by any peril insured against, were damaged through the inattention and negligence of the boatmen, and their failure to perform their duty properly.
Does the rule, that the assured warrants the seaworthiness of the vessel in which Ms goods are laden, apply to these boats?
At least three separate portions of the voyage, were to be traversed, by as many separate and different mediums of transportation, by water.
First.—“By steamer or steamers to Chagres.”
Second.—“ At and thence by the usual conveyances across the Isthmus.”—(A part of the transit across the Isthmus, at that time, was performed by taking goods up the Chagres River, in river boats. These were, then, the usual conveyances.)
Third.—“ And at and thence, by steamer or steamers to San Francisco.”
I think there was an implied warranty of the seaworthiness of each steamer, sailing from New York to Chagres, and carrying the goods in question, at the time she commenced her voyage from the former port. And, that there was the same warranty as to each steamer sailing from the Pacific side of the Isthmus to San Francisco, at the time her voyage was commenced.
The policy by its terms, is.“ to attach only to such risks as shall be approved by the company, and endorsed” on it. It is in effect, a distinct insurance for each voyage, each voyage consisting of three separate parts, through each of which the goods were to be carried by a new and distinct medium of transportation.
The endorsements, made on it of the three sMpments in question, under dates of Sept. 13th, Sept. 30th, and Nov. 2nd, 1850, specify the names of the steamers on which the goods are to be carried from New York to Chagres, but not those in wMch they were to be conveyed from the Pacific side of the Isthmus to San Francisco.
If there was no implied seaworthiness of the latter steamers at the time, they commenced their distinct and independent part *67 of the voyage, there could be none which attached to any of “ the usual conveyances across the Isthmus.”
But if there was, then on principle it should be equally applicable to the vehicle of conveyance across the Isthmus, unless there is something in the terms of the policy, which forbids such an application of the rule.
But it is unnecessary to determine the question whether the assured warranted the seaworthiness of the steamers, which carried the goods on the Pacific,—The goods were not damaged while on board of such steamers. And determining that, this implied warranty did not attach to them, nor to the flat boats, would not, in my judgment, be decisive of the question before us.
By the terms of the policy, the goods in question, were insured against the enumerated perils, at and from Chagres, across the Isthmus, while being transported “ by the usual conveyances.”
The stipulation admits, that, the goods "were transported up the Chagres river, and across the Isthmus, by the usual conveyances, i. e., by the usual river boats, and were damaged on such boats.”
The Court has found that the boats, employed in carrying the goods in question, “ were the usual boats, and the usual means of conveyance employed in carrying goods up the said river, which had been shipped at New York,’on board of the steamers of the said Steamship Company, to be carried thence by the aforesaid route to San Francisco, California.” Even if it should be conceded that, inasmuch as the goods were sent across the Isthmus by the usual means of conveyance, the plaintiff should not be defeated of his action on the mere ground that the law will imply him to have warranted that the boats were in better condition, than that attributed to them by the fair import of the policy, it does not follow that, on the facts as found, the plaintiff is entitled to recover. It must be borne in mind that the goods were injured, “by being saturated with water while being transported in said flat boats.”
That such water entered and came within said flat boats, by reason of the leaking thereof during such transportation of the goods.” And that.no part of the damage to the goods was caused by rain or spray.
*68 That there was “ no evidence whatever of the occurrence of any violent storm, or of any extraordinary peril, or of the encountering of any perils which could have caused the leaking of the flat boats,” and on this also found as an inference or conclusion of law, that the boats, at the time the goods were put on board of them, were unseaworthy, or, in other words, instead of being staunch and tight, were leaky, and that the goods lay in, and were saturated with water, in consequence of the leaky character of the boats, and that the loss sustained did not result “ from any of the perils insured against.”
The gravamen of the complaint is, that the goods became and were wet and damaged by sea water, occasioned by the perils of the seas, and the other perils in the said policy mentioned, and thereby insured against, but how otherwise, in particular, the plaintiff, for the want of information, cannot state more particularly.” These allegations are put at issue by the answer.
The plaintiff is not entitled to recover by merely proving a loss. He must show the occurrence of a peril insured against, and also give evidence that the loss was caused by it.—Coles v. Mar. Ins. Co., 3 Wash. C. C. 159, 161; Coffin v. Phoenix Ins. Co., 15 Pick. 291; Donnell v. Columbian Ins. Co., 2 Sum. 366-272.
When a loss arises from causes, which it is the duty of the carrier to prevent, or which he might have prevented, by the due exercise of reasonable and ordinary vigilance, the underwriter is discharged from liability.—2 Arnould, 774.
So where, the loss is not proximately caused by the perils of the sea, but is directly referable to the negligence or misconduct of the master, or other agents of the assured, not amounting to barratry, the underwriters are not liable.—Mathews v. the Howard Ins. Co., 1 Kern. 9; Genl. M. Ins. Co. v. Sherwood, 14 How. U. S. 352; 2 Arnould, 775, § 287.
These boats are about eight feet by twenty, and about a foot deep, and open at the top. Goods on the bottom are visible to the eye, and any one in charge of them, could not, but see the goods standing in the water which came into the boats, in consequence of their leaky condition.
I think it quite clear upon the uncontradicted evidence, and a *69 just inference from the facts found, that these goods were' not damaged by any of the perils insured against, but by the leaky character of the boats, from the consequences of which, no proper efforts were made by the boatmen, to protect the goods. But, on the contrary, the boatmen, although knowing the goods were exposed to injury from standing in the water, left them thus exposed until they became so injured, that the damage, which has been proved, ensued:
We agree in the conclusion that the goods were not damaged by any of the perils insured against.
The judgment should, be affirmed.
Hoffman, J.
There are three questions arising in this cause. First.—Whether the defendants are discharged in consequence of the special agreement, made between the plaintiff, and the Express Companies ?
Second.—Whether they are discharged by reason of an implied warranty of seaworthiness in the boats, employed upon the Chagres River ?
Third.—Whether they are discharged, upon the facts found, for any other reason ?
I. The defendants knew that the goods were to be sent by the Express Companies. They were shipped as goods are usually shipped by such companies, and the receipts were, in the usual form given to shippers by that line. I am of opinion that, under such a state of facts, the insurers are chargeable with notice of the terms and stipulations usually made with such Express Companies, and that the conclusion of the Judge at special term upon this point was correct.
H. The second question has been treated as the important one in the cause. A point of the counsel of the plaintiff is, that there was no warranty on his part, express or implied, of the seaworthiness of the flat boats on Chagres River. A point of the defendants is, that the goods were injured by the leakiness and unseaworthiness of the boats, and that the defendants are not liable.
The learned Judge found, among his conclusions of law, that the presumption was, that the flat boats were unseaworthy at the time the goods were put on board of them. He deduces this result *70 from facts which he states. He adds, “ that the loss sustained by the plaintiff resulted from the unseaworthiness. of the flat boats in which the goods were transported on the Chagres river, and not from any of the perils insured against.”
The finding of unseaworthiness would, perhaps, have been in a more appropriate place among the conclusions of fact.
Assuming that this fact is established by the evidence, the question is, was there an implied warranty as to the seaworthiness of the boats used on the river ? I cannot satisfy myself that the rules of law establish this.
Implied warranties in voyage policies are conditions precedent, so far as the assured engages for the seaworthiness of the vessel at the commencement of the voyage, when the policy attaches. They are peculiarly so when the policy attaches at the original port of departure. (Watson v. Clark, 1 Dow. P. C. 344; Ogden v. The Amer. Ins. Co., 15 Wendell, 532; 20 Ibid. 287; Phillips on Insurance, 699, and cases there cited.)
The reason upon which an implied warranty of seaworthiness is founded, is the supposition that the assured is aware of the condition of the ship. At her home port, that is, the port of her owner’s residence, this reason is entirely satisfactory. It is less forcible when the ship is in a foreign port, the assured living elsewhere. Yet the rule is equally absolute in this instance. It would be dangerous and subversive of the principle to allow such an exception. (Thompson v. Hopper, 34 L. & Eq. Rep. 275.)
It will be admitted that the reason of the rule is very slightly applicable when the insurance is upon goods. The assured has no control over the outfit of the vessel. He has no right to inspect her condition. Ho presumption of actual knowledge fairly arises. Yet, in this case also, the shipper is held to the implication of the warranty.
This must rest upon the ground that he has the right of selecting the vessel; that he may make general inquiries as to her fitness; and that the advantages of a fixed rule of commercial law prescribe, that he shall be treated as if he had actual -knowledge.
The reason of this rule is well expressed in Gibson v. Small, hereafter noticed. It was there urged by the counsel for the *71 plaintiff in error, that the insurer of goods was by law subject to the warranty of seaworthiness, and that he was equally ignorant of, and had as little control over, the condition of the ship, as the owner who effected a time policy during a voyage.
The Chief Justice said: “ This is quite true, but I think capable of a very simple explanation. At the time when the warranty of seaworthiness was established, the insurer of goods, (who was not the owner of the ship) almost universally laded his goods on board a general ship. The shipowner, in such a case, was subject to a contract, implied by law, that the ship was 'tight, staunch, and strong, and in every way fitted for the voyage,’ or, in other words, ‘ seaworthy;’ and, in the event of damage occurring by reason of this contract not being complied with, the owner was responsible. The owner of goods proposing to insure, would, in order to render the premium as low as possible, naturally represent that the goods were loaded on such a ship; and his situation, when insured, would be, that he was protected, so far as regarded damage arising from unseaworthiness, by the contract of the owner, and as to damage arising from perils of the sea, operating upon a seaworthy ship, by the contract of the underwriter, and this at the lowest possible cost.”
But while the law is thus far definite and settled, the doctrine of an implied warranty is in many particulars modified and restricted.
Thus it is settled, that the implied warranty of seaworthiness does not extend to requiring the ship to be seaworthy throughout her voyage, nor at each successive port at which she is to touch in the course of her voyage. It is satisfied if she is seaworthy at the commencement of the voyage. I speak of seaworthiness in respect of the capacity and fitness of the .vessel physically. Other rules appear to prevail in'relation to the competency of a crew, or to what has been termed statutory seaworthiness, when the employment of a pilot has been prescribed.
Holdsworth v. Wise (1 Man. & Ryl. 673,) is a leading case. The vessel there was insured at and from Belfast, to a port or ports of loading in British America—during her stay there, and back to a port of discharge in the United Kingdoms, between Falmouth and Greenock, on the west side of England and Scot *72 land, or any safe port in Ireland, to call at Cork for any orders. The insurance was against the perils of the sea. The vessel sailed from Belfast—loaded at St. Andrew’s in Hew Brunswick, and on her voyage thence to Valentia, in Ireland, was deserted by the crew, from the apprehension that she was sinking. She was leaky when she sailed from Hew Brunswick, making from eleven to twelve inches every two hours. She was taken in tow, and carried into Hew York. The point was made, that the policy included an implied warranty of seaworthiness in the ship, and good seamanship in the crew, at every port, from which she sailed in the course of the voyage; and as she was making eleven to twelve inches water, every two hours, at the time of her leaving Hew Brunswick, she was not seaworthy. The Court, after advisement, held unanimously, that the implied warranty did not extend to the ship being seaworthy at every port from which she might depart in the course of her voyage.
Mr. Justice Duer, in the fifteenth lecture of his Treatise on Insurance, yet unpublished, says:—“ The law may be considered settled both in England and this country, that so far as concerns the intrinsic qualities of the ship itself, as tight, staunch, and strong; its physical capacity, independent of crew, stores, or equipment; the implied warranty of seaworthiness refers exclusively to the commencement of the voyage, whatever may be its probable duration, and however numerous and various the risks that it embraces; and, consequently, if the warranty is then satisfied, there can be no subsequent breach. Thus restricted, the proposition is certainly true that there is no implied warranty that the ship shall continue seaworthy during the voyage.”
The learned author proceeds to discuss the subject of the duty incumbent upon shipowners and their agents, to make all reasonable repairs, to keep up the competency of the ship for her further progress, where defects are discovered, and the means of removing them are accessible.
It is sufficient to observe how important the distinction is, whether the assured is bound to give evidence (sufficient to raise a presumption at least) of seaworthiness at each intermediate point of a voyage, or whether the insurers are called upon to prove neglect of a duty, and the possession of the means to fulfil *73 it. I understand the rule to be, that in cases of an implied warranty, the burthen is upon the assured to prove a compliance with it as a condition precedent to the attaching of the policy.
The decisions upon the question of warranty in time policies axe of importance upon this point.
The result of Gibson v. Small, (16 Queen’s Bench Rep. 141, 24th Eng. L. & Eq. Rep. 16; 3d House of Lords, Ca. 353; 3 Eng. L. & Eq. Rep., 299,) is thus stated by Earl Justice: “ The Court decided that the plea there was bad, seemingly on the ground, that if a ship insured on a time policy is at the commencement of the risk in an unknown sea, and in an unknown state, the owner does not warrant that it is in the state requisite for setting out on a voyage. To this extent all the Courts are bound.” (Thompson v. Hopper, 34 Eng. L. &. Eq. Rep. 270.)
This was the decision in Jenkins v. Heycock, (8 Moore’s Priv., Coun. Ca. 351,) where there was a time policy, and the vessel was seaworthy at the commencement of the risk, but became unseaworthy at an intermediate port. There was no continuing obligation.
And such was substantially the case of Capen v. The Washington Insurance Company, November 1853, in Massachusetts, The policy was made April 30; the risk to commence March 30, when the vessel was at sea. She came back to Boston in September, and was lost on a subsequent voyage. It was ruled that there was no implied warranty in the common acceptation of the term, either at the date of the policy, or the commencement of the risk, but only that the vessel was to be in existence as a vessel at the time of the commencement of the risk, capable of being made useful, if then in port, with proper repairs for navigation, and was seaworthy when she first sailed from port; or if at sea when the risk commenced, that she had sailed in a seaworthy condition, and was safe, so as to be a proper subject of insurance at the time the risk attached.
In Jones v. The Insurance Company, (2 Wallace, 278) Mr. Justice Grier limits the implied warranty in a time policy to a case in which it is shown, either that at the time the insurance commenced, the ship was in her original port of departure, and commenced her voyage in an unseaworthy condition, and so *74 continued until the time of her loss; or that having come into a distant port, in a damaged condition, before or after the commencement of the risk, where she might and ought to be repaired, and the owner or his agents neglected to make such repairs, and the vessel was lost by a cause which may be attributed to the insufficiency of the ship. And Ogden v. American Insurance Company, (20 Wendell, 287) determines only that there is an implied warranty of seaworthiness at the commencement of the risk.
The English courts have, however, gone further, and entirely abolished the doctrine of an implied warranty in a time policy.
Lord Campbell and Mr. Justice Park had intimated an opinion in Small v. Gibson, that this was the rule. Lord St. Leonards, and some others, expressed their views to be that, in a time policy on an outward bound ship, about to sail from a port where the owner resides, there is an implied warranty of seaworthiness at the commencement.
In Jenkins v. Haycock, the Judicial Committee of the Privy Council stated their concurrence in the views of Lord Campbell; and in Thompson v. Hopper, and Fawcus v. Sarsfield, 34 L. & Eq. Rep. 270, 277; the Court of Queen’s Bench, (Earl dissenting,) declared the rule expressly, that there is no implied warranty of seaworthiness in any case in a time policy; and this, whether the ship at the commencement of the risk, be at sea on her voyage, or be, at the date of the policy, in a port, about to sail on a voyage, where there are means of making her seaworthy.
These important cases show, not only that the Courts are reluctant to extend the doctrine of implied warranty, but, also that, where there had been no trace previously of a distinction between time and voyage policies, they first denied the existence of the doctrine in the former, except possibly, at the commencement of the voyage and at a home port, and then discarded it altogether. They show again, that the underlying principle of the first class of these decisions (now sustained by nearly the whole judicial strength of England) is the fact, that the owner has not knowledge of the state of the vessel, nor control over her. And the repugnance to the extension of the doctrine is strikingly manifested when we find, that when the reason ceases, *75 (as, in relation to a home port it does,) the rule as to voyage policies is rejected.
But the Judges take care to guard this proposition with another; that misrepresentation or concealment will still have its full effect in absolving the underwriters from the contract. “ The Insurers are protected whenever there is any fraudulent representation or concealment. They may make inquiries, and introduce an express warranty, and they may always insist on a premium adequate to the risk which they will incur.” Lord Campbell in Thompson v. Hopper.
The present case exhibits circumstances quite peculiar and new, 'as far as I have examined the subject. The risks were separate and distinct. They were so, not merely as variations of risks of the same character, at different stages of one continuous voyage, in one vessel; but were risks of a somewhat different nature, on successive transportations of goods, by different modes of conveyance.
The first stage (not of a voyage, but of the transportation) was by a steamer from the port of the shipper to Chagres. The implied warranty may fully apply here.
The next stage was “ at Chagres, and thence by the usual conveyances across the Isthmus.” The last was “ at and thence by steamer or steamers to San Francisco.”
In the second portion of the conveyance, no boat or vessel is named; none could be named. There is not even a general description or classification of the nature of the conveyances. Usual modes of conveyance must be assumed to have been equally well known to both parties. Is there an instance of the transfer of such a warranty from the original ship to lighters, or to any other vessel into which, upon an accident, the goods might be removed?
Beyond a doubt, the course of modern decisions is to check and restrict the theory of an implied warranty. It appears to me that the present case is one without a precedent; and I do not see that it is fairly within any principle which has been allowed to govern in the cases upon the subject.
Had the case turned (as it was mainly argued) upon this question only, I should have felt by no means convinced that there was an implied warranty of the boats on the river.
*76 III. But, on the assumption that there was no implied warranty of the seaworthiness or entire sufficiency of the boats, there is another point in the case which will determine the question of liability of the defendants. The loss arose from water breaking into the flat boats, saturating the boxes, it being suffered to remain without being pumped out, and the gross negligence and inattention of the crew of the boat in not doing their duty. Add to this the fact of the boats being leaky when the goods were shipped, and we have all the causes of the damage. It is found, that there was no evidence of the occurrence of any storm, or of any extraordinary peril, or of the encountering of any perils, which could have caused the leakage of the boats.
The neglect and fault of the owners of the boats, when they took the packages on board, and the culpable neglect of the crew during the transit, form the essential causes of the loss.
The causes are not literally within any of the perils insured against. The general words, “all other perils, losses,” &c., in the most extensive sense, would only cover perils of the same character. Thus, a peril of the river, from a tempest, would be equivalent to a peril of the sea. (Moses v. The Mutual Ins. Co., 1 Duer, 172; 1 Phillips, 1126.)
It may now be assumed as incontestable law, that while the occurrence of a peril, actually insured against, renders the underwriters liable, though traceable to the neglect of the master and crew, yet they are not answerable for any loss, not within enumerated perils, occasioned by such neglect. (General M. Ins. Co. v. Sherwood., 14 Howard’s U. S. Rep. 352; Philips on Insurance, Art. 1057, 4th Ed.; Moses v. The Mutual Ins. Co., ut supra.
The contract with the express company exempts the latter from liability for any loss or damage “ from perils of the seas, river navigation, leakage, fire, or from any cause whatever, unless the same be proved to have occurred from the fraud or gross negligence of the principal, the agents, or servants of the line.”
Therefore, if the agents were guilty of gross negligence in putting the goods on board of a boat known to them to be insufficient, or which slight attention would show them to be so, an action would lie against them.
And, on the case as made, the owners of the boats on the river *77 would be responsible. The fact, that such a redress may be hopeless, cannot affect the bearing of the fact of such a legal liability of owners. (Blackstock v. The Erie R. R. Co., April Term, 1857.)
The assured and assurers entered into the contract in the policy with the knowledge that the responsibility of common carriers was, as to the Express company, thus restricted. We have held that this is not enough to discharge the insurers from liability on that ground alone, viz., their inability to avail themselves of recourse by subrogation to the Express company as carriers. It is equally clear, that this fact is not to operate to impose any responsibility upon them beyond their contract.
For these reasons, I consider that the insurers are not responsible for the loss for which the action is brought, and that the judgment should be affirmed.