Barbour, J.
I find no authority in the elementary writers on maritime insurance, nor in either of the many cases upon that subject which have been reported, for holding that, as between the assurer and the insured, the owner of insured cargo, not being the proprietor, also, of the ship, has any rights other than such as are possessed by the owner of a ship, upon which a policy has been effected by him. Nor am I able to discover any difference in principle, in this regard, between a man who is the owner of insured cargo on board his own ship, and one whose property is laden upon the vessel of another, and who, by employing such vessel to transport the same, makes the master his agent and representative for the purposes of the voyage. (See 2 Kent’s Com. 7th ed. p. 626, n.; and 3 id. 372, text.) In either case, the assured warrants the seaworthiness of the vessel, and retains to himself the risk of all losses proximately caused by the frauds or other wrongful acts of the master, not barratrous, and, indeed, all risks of losses not covered by the policy, and proximately caused by the perils insured against. I shall, therefore, assume at the outset of the examination of this case, that the owner of the cotton here has precisely the same rights which the ship owner would have been, entitled to, had he been also the proprietor, and that he is subject to like restrictions and liabilities, so far, at least, as concerns this question of contribution in general average.
In all contracts of marine insurance for a voyage, whether upon a vessel, its freight, or the cargo on board, the law implies a warranty on the part of the assured, that the vessel is of the character described in the policy, and that she is seaworthy, at the commencement of such voyage to perform the same.
In this ease, the vessel is stated in the policy to be a steamship i a word which imports a three masted, square rigged vessel, capable of being propelled by sails and steam, or by either. This statement is not only, in itself, an express warranty that the vessel is of that description, but the warranty of seaworthiness, implied in all contracts of maritime insurance, *544 attaches to her in both characters ; so that, when the voyage commences, she0 must be fully and adequately equipped, manned and provisioned, both as a steamer and as a sailing vessel.
It cannot be disputed upon this appeal, that when the steamship covered by the policy in this case left the port of New York upon her voyage, she was entirely seaworthy ; for so the jury have found under a charge to which there was no exception in that regard. But, in the view I take of the case, it is important to ascertain whether the evidence given upon the trial was sufficient to authorize the jury to find, had that question been presented for their consideration, whether the vessel was seaworthy when she left Halifax, and if not, to what extent, if any, the master was guilty of negligence in leaving that port while she was in an unseaworthy condition. The appellant claims that she was deficient, both in sails and fuel.
The master stated in his examination upon commission, which was read in evidence upon the trial, in giving his reasons for burning the plaintiff’s cotton, and, evidently, for the purpose of showing that, when the cotton was burned, the ship was in such a condition that she could not have been taken into port by means of her sails alone ; that the vessel had lost several of her sails, having, on the night she left New York, split the fore-top-sail, and other sails in succession. This, it appears to me, was, in effect, saying to the jury that the sails, split before reaching Halifax, remained lost at-the time it was resolved to burn the cotton; and I think that would have justified them in finding, if they credited the evidence, that when the vessel left Halifax her complement of sails was materially deficient, and, for that reason, that she was then unseaworthy.
' The ship left New York at a quarter past six o’clock-in the afternoon of the 23d of October, and anchored in Halifax at a quarter past seven in the afternoon of the 28th, during which period of five days and one hour she consumed 280 tons of coal; being at the rate of about fifty-six tons per day. When, she left Halifax, she was furnished with 645 tons ; being a supply, at the same rate, for a fraction over eleven days and a, *545 half j while the ordinary length of a voyage by her from that port to Gralway, in time, was about nine days.
It was proven that the distance from New York to Halifax was 577 miles, and from the latter port to Gralway 2182 miles. Taking the time occupied by the vessel in running from New York to Halifax, and her consumption of coal during that portion of her voyage, as a basis for calculation, she would,therefore, have required over eighteen days’ time, and more than a thousand tons of coal, from the latter port to Gralway ; and as we have seen, she actually had but 645 tons on board when she left Halifax.
Captain Marshall, who built the steamer and ran her himself for more than a year, testified that she often consumed as much as 60 or 65 tons per day; and, with hard driving, even-more than that.
It was also proven that the vessel continued to burn coal for twelve days after she left Halifax, at an average rate of about 45 tons per day, and that she was then in latitude 54 ■degrees 19 minutes north, longitude 15 degrees 36 minutes west, or, nearly 300 miles from her port pf. destination; although she had experienced but five days of stormy weather.
It appears to me that this evidence was sufficient to warrant the jury in finding, had the question been submitted to them, that the quantity of coal with which the steamer left Halifax was insufficient for the safe prosecution of the voyage; and, also, that the master was guilty of gross negligence in omitting to take on board an adequate supply there, as well as in failing to replace the sails that had been carried away.
No branch of the law of maritime insurance, perhaps, has been more discussed, or has given rise to a greater apparent contrariety of opinions, than that concerning the liability of underwriters in cases where the vessel containing, or being, the subject insured, leaves an intermediate port in an unseaworthy condition, and is afterwards lost or injured, during the life of the policy, in consequence of the perils insured against. Much of this difficulty has been caused, no doubt, by the efforts which have been made,, from time tp time, by *546 many able judges and elementary writers, to so extend the warranty of sea-worthiness as to cover, not merely the state of the vessel at the commencement of the risk, but its condition in regard to seaworthiness on leaving every intermediate port, whether of distress or call, and, indeed, ■ at every stage of her voyage, and the exertions which have been made by other as eminent men to uphold the contrary doctrine; resulting, naturally, .if not necessarily, not only in the expression of extreme opinions upon both sides, but in overlooking, in many instances, the true legal obligations and liabilities of the assured. (See Dixon v. Sadler, 5 Mees. & Welsb. 405; Holdworth v. Weir, 1 M. & Ryl. 671; Peters v. Phenix Ins. Co., 3 Serg. & R. ; Putnam v. Wood, 3 Mass. Rep. 481; 2 Phil. on Ins. 114.; Paddock v. Franklin Ins. Company, 11 Pick. 227.)
I confess, I have never been able to comprehend and appreciate the force of the reasoning by which eminent jurists and writers have endeavored to establish the doctrine that underwriters are discharged from liability in this class of cases, through or because of an assumed warranty of future sea-worthiness, posterior to the commencement of the risk, supposed to be implied in the policy or contract of insurance. Nor can I perceive any necessity for resorting to that doctriue to estaba lish the non-liability of the underwriter in such cases. For, by receiving the premium and executing the policy, the insurer acquires an equitable interest in the subject insured, to the extent of the risk he assumes, but the property is, necessarily, left in the possession of the assured, or, of his agent and representative, the master, for the purposes of the voyage ; by the acceptance of the policy, and as such custodian of the property thus equitably belonging, pro tanto, to the underwriter, and convertible, in toto, into a legal ownership, in case of a technical total loss and abandonment, the assured, it appears to me, assumes, in regard to that interest of the insurer, a character and position similar to that of a mandatory, and takes upon himself the duty of prosecuting the voyage, and managing the property so entrusted to his care, and that of his agent, *547 during the risk, and so long as such interest of the insurer continues to exist, as a skillful, careful, and prudent man would do, were he his own insurer ; and if he fails to do so, and the property becomes lost through his culpable negligence, or that of the master he has employed, either as ship-owner, or by sending his goods on board as cargo, I see no reason why that will not constitute a perfect defense for the insurer, upon well established principles of law in an action against him upon the policy, independent of any supposed warranty that the vessel shall be seaworthy after the voyage has actually been entered upon. (See Story on Bailm. § 137 et seq.)
In Paddock v. Franklin Ins. Co., (11 Pick. R. 227,) Ch. J. Shaw, after stating, in'effect, that the obligation to keep the vessel in good condition, and to repair damages for that purpose when practicable, is included in the implied warranty of seaworthiness, holds, that after the policy has once attached, the implied warranty should be so construed as to exempt the underwriter from all loss or damage proceeding from any cause thus warranted against, but to 'hold him still responsible for those losses which, by no possibility, could have been occasioned by a peril increased or affected by such warranty^that, if a vessel needing repairs or supplies,- leaves a port in which they could have been obtained, without procuring them, it is a fault and instance of negligence on the part of the owner ; and if she be afterwards lost by a cause which may be attributable to the insufficiency of the ship, and which cannot he traced to some independent and wholly distinct cause, such as capture or fire, the underwriters are discharged.
In Starbuck v. N. Eng. Mar. Ins. Co.,(19 id. 198,) the same court held that if the ship becomes unseaworthy upon the voyage, it is -the duty of the owner, as soon as he discovers it, to make her good; and that, if he does not repair her when he reasonably ought to do so, and a loss arises from it, the assured cannot recover, because it is not a loss by any of the perils insured against; but that if the loss arises from another cause, he may recover.
In The American Ins. Co. v. Ogden, (20 Wend. R. 287,) *548 a vessel, sailing from Norfolk to St. Thomas, lost her anchor in going into Charleston, an intermediate port, and failed to replace it there ; and this rendered her unseaworthy when she left the latter port. She was afterwards damaged by some of the perils insured against, but to which the loss of the anchor in no wise contributed, and was abandoned. Chancellor Walworth, in the court for the correction of errors, said that the implied warranty of seaworthiness was applicable, only to the commencement of the risk, and not to any intermediate port during the continuance of the voyage, unless such unseaworthiness was caused by some accident or peril not covered by the policy; that if the warranty is complied with at the commencement of the risk, and the vessel is subsequently rendered unseaworthy by a peril insured against, it is only necessary ..that the master should use reasonable diligence to put her in a proper condition to proceed on her voyage ; and that, when there has been negligence on the part of the master in this respect, the underwriters are only excused from the payment-of the subsequent loss or damage which may have been caused or sustained by the want of such diligénce.
Senator Verplanck, in the same case, after expressing the opinion that the warranty of seaworthiness is fully complied with if the vessel is seaworthy when the risk commences, says : “Any defect of seaworthiness, arising afterwards, from bad faith, or want of ordinary prudence or diligence in the owner or his agents, discharges the underwriter from liability for any loss occasioned by, or in consequence of such want of faith, prudence, or diligence, but no others.” (See also Hollingworth v. Broderick, 1 Lond. Jur. 430 ; Coolidge v. New York Firemen Ins. Co., 14 John. 307 ; Van Valkenburgh v. Astor Insurance Co., 1 Bosw. 61; Capen v. Washington Insurance Co., 16 Law Reporter, 465 ; Hazard v. New England Marine Insurance Co., 1 Sumner, 218 ; Deblois v. Ocean Insurance Co., 16 Pick. 303; Mathews v. Howard Insurance Co., 11 New York Rep. 9.)
I am fully satisfied, upon a careful examination of the numerous cases upon the subject which are found in the books, *549 that, however widely judges may have differed in regard to the technical reason of the rule, it is now well settled with us, that, in all cases in which the three following facts are found to exist, concurrently, the underwriter is exonerated from liability ; that is to say : First. Where the vessel which is, or contains, the subject matter of the insurance, leaves an intermediate port, whethér a port of call or of distress, in an unseaworthy condition. Second. Where such condition is owing to the gross or culpable negligence of the master; and third, Where the property insured becomes lost or damaged, because of the particular defect that rendered the vessel so unseaworthy, or, by some means to which such defect directly contributed.
The above facts, in regard to sails and fuel, therefore, if' hound by the jury, in this case, would have entitled the defendants to a general verdict in their favor ; and I think they would have been justified by the evidence in finding them, had the questions been submitted for their consideration. For, not only was the evidence sufficient to have warranted a finding that the steamer left Halifax in an unseaworthy condition, owing to the gross negligence of the master, as I have already said, but it is quite certain that the necessity for using the cotton as fuel, if such necessity existed, was caused by the unseaworthiness of the vessel, when she left Halifax, because of her inadequate supply of coal for the voyage before her.
For these resons, I am of opinion that the learned judge before whom the cause was tried erred in charging the jury that the defendants could not avoid responsibility upon the ground that the captain omitted to take in a larger supply of coal at Halifax, or to make repairs to the sails.
It appears to me, also, that there was error in admitting a portion of the surveyor’s certificate to prove what repairs were necessary to he made to the steamer, and the expense of those repairs; and that decision was of the utmost importance, inasmuch as it furnished the only ostensible evidence touching those matters.
The certificate, which is dated on the 12th of March, being more than three months subsequent to the arrival of the ship *550 at her port of final destination, after describing the condition of the vessel, as found by the surveyor, upon' examination, on the first day of that month, states his opinion as to what would be necessary to have done to her, in order to repair the losses and damages she had sustained, and then sets forth his estimate of the cost of repairing and making good such losses and damages, amounting, in the aggregate, to over eleven thousand pounds "sterling.
The surveyor was examined on commission, as a witness in the case, and said, “ The condition of the ship appears fully by a report made by the witness, dated the 12th March, 1859, a true copy of which is hereto annexed.” .But he did not state, on such examination, that any of the repairs mentioned in his certificate were, in fact, necessary or proper; nor did he give any opinion whatever touching the estimated cost of making such repairs. Indeed, the certificate shows upon its face, that £5,050, of the amount of such estimated cost of repairing, is not the estimate of the surveyor himself, but is, merely, a statement of one, which is said in the certificate to have been made by an engineer.
The defendants’ counsel objected to so much of the certificate as embraced the opinion of the surveyor touching what was necessary to be done in order to repair the damages sustained by the vessel, and the estimate of the cost of those repairs ; and I think that objection was well taken. For, the survey or having been.an ex parte proceeding, was not admissible as evidence for the plaintiff, in the absence Of evidence tending to substantiate its correctness. (Abbott v. Sebor, 3 John. Cas. 39. Mitchell v. New England Insurance Co., 6 Pick. 117. Saltus v. Commercial Insurance Co., 10 John. 487. Watson v. Insurance Company of North America, 2 Wash. C. C. R. 480.)
I am, therefore, of opinion that the judgment ought to be reversed, and a new trial granted.