By the Court.—Sedgwick, Ch. J.
The seaworthiness of the brig Hunter was viewed on the trial in several aspects. The defendant’s claim was that the deck load rendered her unseaworthy ; first, simply from its situation upon the deck; second, because it overloaded her, and by its'weight lessening her free-board, or height of side above the water, to an extent that made her unseaworthy. It is assumed that the plaintiff should not have recovered, unless the testimony established prima facie that the vessel was seaworthy (Moses v. Sun Mutual Ins. Co., 1 Duer, 159). I understand that case to mean, that the insured need, in the first instance, given only slight, perhaps general, testimony as to the seaworthiness of the vessel; but that, at the end of the testimony, it should appear affirmatively that the vessel was seaworthy, in the particular,, if any, as to which there has been an attack. I think that, on the trial, there was evidence which supported the verdict of the jury, that the brig had enough free-board to make her seaworthy, and also, with some hesitation, that the situation of the load, on deck did not make the vessel so unsteady that she was, therefore, unseaworthy.
*441 But I am of opinion that, under the special circumstances of the case, the situation of the deck-load called for explanation from the plaintiff, which was not given in other respects than have been noticed: “It is a general and an ancient rule of the law of shipping that goods shall not be carried on deck. ' The reasons for this are obvious—not only is cargo there placed more liable to loss, because, if waves swept the deck, it would be washed over; but it would greatly endanger both ship and cargo, as it puts the weight far from the keel, and, by raising the center of gravity, makes the ship less stable. It incumbers the deck, which might be a matter of grave importance in a storm ” (2 Parsons Mar. Ins. 217). The facts showed that the deck-load, in this case, in the absence of proof to the contrary, incumbered the deck in such a manner and to such an extent that the movements of the crew, in navigating the vessel, were likely to be impeded, and especially so in case a storm should release the deck-load from its fastenings and it should roll or be thrown over the deck. It is not necessary to say that any deck cargo, irrespective of its quantity, kind, and shape, would be presumed to render the vessel unseaworthy. It is only intended to decide that this particular deck cargo called for explanation at least. I cannot find any satisfactory testimony in the printed case, as to the quantity of deck cargo. It appeared that there were at least one hundred and nine barrels of rosin and thirty-seven cases of kerosene on the deck. It did not appear in what way they were fastened or stowed, excepting that the mate testified that the barrels were stowed on their sides and the cases were as high as the barrels, and he thought there were a few cases on top of the barrels. That the deck was greatly incumbered is shown by the quantity, as well as by the further testimony of the mate. In his deposition, the following questions and answers appear:
*442 ‘‘ Q. How many barrels of rosin was there on deck ? A. I can’t tell yon—don’t recollect. Cj. Was the deck-full ? A. There was a good many; no, it Avas not at all full. Q. How near full was it ? A. I don’t knoiv; it was not all full; anyhow we had water casks on deck besides. Q. Was there room for any more cargo on deck than that which you had \ A. I don’t think thei ° was ? Q. You mean to say that there Avas no more room for any more cargo on the deck of that-brig % A. We could have put more on. Q. How could you put more on it ? A. Find room for it forward by the foreside of the house, perhaps. I don’t' know how many more barrels we could have put on deck. V ery likely ten. I would not swear to ten or any number. I may put more than five, perhaps. ”
This being the state of the evidence, I think that the plaintiff should, at least, have shown affirmatively that the deck cargo was not likely to interfere Avith the due management of the brig.
The learned counsel for respondent agreed that it was a question for the jury, as to whether the stowing the cargo upon deck was not an act of barratry on the part of the master. Whatever pertinency this position, if well taken, might have upon the question that arose from the jettison of the deck cargo, and the liability of the defendants to pay for the loss of a deck cargo, I do not see that it has any relevancy to the inquiry whether the brig was seaworthy at the time the policy attached. That seaworthiness should exist, was a condition precedent to the insurers becoming bound in any way. No case is cited, nor is a principle urged, upon which it can be held that the fact of seaworthiness, as a condition precedent, is waived or ceases to be a condition, if the unseaworthiness has been created by the intentional wrong of the master. The implication that the insurer’s contract, in respect of a seaworthy vessel, is not the less jnst in a case of insurance upon cargo *443 not owned by the ship-owner. The owner of the cargo, in effect, contracts that the vessel is seaworthy.
As to the effect of the cargo on deck on the navigation of the brig, no explanation was given. It was not "shown that it was the custom or usage to carry deck cargo on voyages like this. There was no attempt to show that the deck cargo did not interfere, or was not likely to interfere, with the due management of the brig.
The defendants also claimed that the vessel was unseaworthy, because she took no pilot in sailing out of the port of New York. This point will be passed upon, under the case of Keeler v. Fireman’s Ins. Co. (3 Hill, 250). A statute of the kind invoked by the defendants (Laws 1857, c. 242, § 29, p. 501), that all masters of foreign vessels, &c., shall take a licensed pilot, may perhaps, under the case last cited, be considered directory in certain respects ; but the statute creates a presumption that such a vessel is not fitted to sail out of the port without a licensed pilot, especially when, as in the case of this port, it is the custom or usage for such vessel to take a pilot. To answer this presumption, and to show that there was seaworthiness, the insured must prove that the person who actually took the vessel out was acquainted with the navigation of the port, and possessed skill and capacity, proportioned to the difficulties, sufficient to make him a proper pilot. In the present case there was no proof of any previous knowledge of the difficulties of the port or of sufficient skill and capacity to avoid or overcome them on the part of the master of the brig, who took her to sea. The fact, that he navigated her safely on the particular occasion, did not tend to show any competency. He may have been a learner, or taken the risk for the first time.
On the question of general overloading, there was *444 evidence enough to uphold the finding that she was not unseaworthy therefrom.
The learned court submitted the questions that concerned the seaworthiness to the jury, in an impartial way; but I am of opinion' that the evidence showed that the vessel was' unseaworthy, in the particulars already noticed as sustaining such a- claim, and that the motion to dismiss the complaint on that ground should have been granted.
The defendants were made responsible for the loss "of the deck load. The plaintiff claimed that it had been jettisoned. The defendants insisted that the proof was that it had been washed overboard. Perhaps the protest contains the truth on the subject, but its contents were not in evidence. There was some testimony that the deck load had been intentionally thrown over to lighten the vessel, and it seems that the defendants are concluded by their acquiescence in a declaration on the trial by plaintiff’s counsel, that it was agreed that one hundred and nine barrels of. rosin and thirty-seven cases of kerosene were jettisoned. The circumstances of the jettison of this deck cargo raise, questions, perhaps, that were not mooted upon the argument, and attention will be confined to an exception that relates to the charge on this subject. The counsel for plaintiff claimed that the insurers were liable for the value of the deck cargo thrown over, if the master was, in loading it upon deck, guilty of barratry. The court .charged “ that if the master of the vessel, having chartered his vessel for a full cargo under deck, and having given bills of lading for the whole cargo as being under deck, took a portion of the cargo on deck, such an act, if done knowingly and willfully, would be a willful wrong on the part of the master against the owner of such goods, which would constitute barratry.”. This was excepted to by counsel for defendants, and the ground urged on the appeal was, that, to be bar *445 ratrous, the master’s act must also be fraudulent. I am, however, of the opinion that the substance of the opinions in Atkinson v. Great Western Ins. Co. (65 N. Y. 532) does not necessitate the use of that word fraudulent. It is enough if the jury find that the wrong was done with a knowledge or consciousness that it was wrong, and that it was done willfully. I understand that case to assert, in effect, that willfully in that connection means that the act is done purpqsely as a breach of duty, rather than negligently, by omitting to consider that it is a breach of duty. Although I am of opinion that such is the right application of the case cited, nevertheless it must be recognized that there is a doubt of it.
It is proper to say here, that the charge referred to the barratry as being a wrong against the owner of the cargo jettisoned, and did not refer to it as being a willful wrong against the owner of the ship also. The matter may have some importance, because it may be questioned, how successfully need not be here said, that if it is only a wrong against the owner of the cargo, as being a violation of the bill of lading, or of some other implied contract, whether resort should not be had to the ship or ship-owners, rather than to the insurers. In the case of Atkinson v. Great Western Ins. Co. (supra), it can be observed that the opinion of the court considered the act of barratry that was alleged, to have been barratrous as to the owner of the ship, as well as to the owner of the cargo.
The court also charged that the burden of proving the amount of damage resulting from leakage alone is upon the defendants. To this an exception was taken. There can be no doubt that a great part of the loss occurred from the escape of kerosene through holes or crevices in the tin cans, or through imperfectly fastened joints, or joints that had been opened by accident or by shocks received on the voyage. There can *446 be no doubt, also, that the cans had received injuries from sea-perils, and which permitted the great part of this leakage. Neilson v. Commercial Mut. Ins. Co. (3 Duer, 455) decides that a clause like one in the present policy, which is, “not liable for leakage on molasses or other liquids, unless occasioned by stranding or collision with another vessel,” comprises leakage caused by sea-perils insured against, as well as ordinary leakage.
Kespondent’s counsel argues that the word “leakage,” in the clause, refers to a leakage from packages of a kind that theretofore had been usually thought of as liable to leakage, and which usually occurs through inherent defects, and not from cans in cases of kerosene, they being articles as to which leakage from inherent defects were not to be apprehended. The answer to this is two-fold. First, the word leakage, in the contract, must be construed to mean, leakage from whatever vessels it may occur. Second, from the evidence of the merchants in the case as. well from general knowledge of what a tin can is, it appears that tin cans are, from their mode of manufacture, as liable to leakage as barrels.
It is further said that the loss to the plaintiff occurred from the damaged appearance of the' cases of kerosene, rather than from a deficiency of the contents through leakage. The evidence is against this. The testimony of the merchants shows that valuations were placed upon the damaged cases with a regard to the quantity of the contents.
The plaintiff, on the trial, was bound to prove the amount of damage, under the stipulations of the contract. The burden of proof was upon him to prove the amount as well as the cause of action in other respects. In his case, it appeared that the amount he claimed was, to a great extent, made up of the value of kerosene that had leaked from the cases. He therefore *447 claimed to recover something that, according to views already taken, he was not entitled to claim from defendants. Under these circumstances, I do not think the defendants were bound to limit and describe this wrongful excess by showing how much leakage there was. The clause cannot be viewed as an exception in the contract from general liability. It was a limitation of liability, in respect of the consequences of perils of the sea, and the plaintiff was bound to show what consequences had happened, for which the liability actually existed. No doubt, on the facts, it might, in the absence of other proof, appear that a loss of a kind had happened that would make an insurer liable ; and, in such ease, the insurer would be bound the introduce sufficient testimony to show what the facts really were. It would be doubtful, then, whether the insurer would be bound to do more, in the first instance, than to show that the insured claimed for a damage not contemplated by the policy, without proving its quantity. “Excepted risks are sometimes, by the circumstances of the case, mingled with those insured against, so that it is not quite easy to say to which class the loss is owing. The general rule must be that the insurers are liable or exonerated, according as the leading principal cause of loss be one insured against or one that is excepted; and, in such a case, the burden of proof is on the insured to show definitely the amount of his loss by the peril insured against ” (1 Parsons Mar. Ins. 620, citing Heebner v. Eagle Ins. Co., 10 Gray, 143). I am therefore of opinion that this exception should be sustained.
Judgment reversed, and new trial ordered, with costs of appeal to appellant, to abide the event.
Speir, J., concurred.