Robertson, J.
This action was brought on a time policy of insurance, for a year from March 22d, 1854, for $10,000, on the brig Brenda, her tackle, apparel and furniture, valued at $20,000, each passage to be subject to separate average, and no particular loss or particular average to be payable unless amounting to five per cent On the 4th of February, 1855, the brig sailed from Hong Kong, in China, bound to Shanghae, on the river Woo-sung, and back: on the way, after encountering stormy weather, she ran aground on the south bank of the river Tang-tze-kiang, into which the Woosung empties, and became so imbedded in the mud that the tide flowed into *47 her as it rose: while so aground, her crew were taken out, also as much of her cargo and equipments as could be got at, and holes were bored in her, above the copper, to let the water out. After a vain attempt, for two days, to get her off by a steamboat, she floated by force of the rise of the tide. She then got under sail, and arrived at the town of Woosung, on the river of the same name, just above its confluence with the Yang-tze-kiang, and below Shanghae: after a survey of her at Woosung, her master determined to return to Hong Kong. On the 10th of March she set sail from the last named place; on the 11th encountered gales; on the 12th began to leak, which leak gained rapidly, until she was one-third full: after throwing over ballast, the wind blowing furiously, and the press of canvas increasing the leak, sail was shortened, and she was finally anchored off Rugged Islands, being more than half full of water. In seven hours afterwards she was nearly full, and settled by the head: she was then abandoned by the officers and crew, drifted, fell over on her beam ends and sunk. On the 15th of March, 1855, the crew sailed for Shanghae and Woosung; on the 17th the master and officers signed a protest, at Shanghae, of the voyage from Hong Kong, and on the 19th, of that in which the brig foundered.
The plaintiff’s claim in this action, consists of general and particular average on the voyage to Hong Kong, and the sum of $10,000 for the total loss of the brig on her return voyage.
On the trial, two questions were submitted by the presiding judge to the jury, with a direction that, if they answered either in the affirmative, they should find for the plaintiff; which" was excepted to. They answered both in the affirmative. Such questions were as follows:
First. Was the brig, when she sailed from Woosung to Hong Kong, in a suitable condition to make it safe for her to undertake that voyage in ballast ?
Second. Did the master, when he started on that voyage, after a careful examination of the brig, made in good *48 faith, judge it safe to proceed with her in ballast to Hong Kong, and that such a course was the best to be pursued for all parties concerned ?
After a number of requests by the counsel for the defendants to the presiding judge, to charge in reference to the claim for partial loss, the former requested the latter to charge the following propositions in reference to the claim for total loss:
First. G-enerally, that the plaintiff was not entitled to recover for a total loss.
Second. That, as it appeared that the hull of the brig was in a damaged condition when she left Woosung, that she leaked while at anchor, and the leaking gained upon her until she foundered, the presumption was, that she was lost by reason of her unfit and insufficient condition for the voyage at its commencement, and not by reason of the happening of any of the perils insured against.
Third. That, as it appeared the proximate cause of the loss of the brig was her damaged condition at the time she left Woosung, and that the said damage might have been repaired there before sailing, the defendants were not liable for the loss.
Fourth. That, as it appeared that the brig might have been repaired at Woosung, it was the duty of the master to have repaired the damage sustained by the brig in the voyage from Shanghae.
Fifth. That, as respected the duty to make repairs at Woosung, the master was the agent of the plaintiff, and his omission to make them was at the risk of the latter, and not of the defendants.
Sixth. That the foundering of the vessel on the voyage to Hong Kong was reasonably to be attributed, upon the evidence in whole or in part, to the crippled and damaged condition of the brig when she sailed from Woosung; that such condition increased the hazards of the voyage, and the plaintiff was not entitled to recover for the loss of the brig.
Seventh. That the defendant was not liable for the loss, if the omission by the master to repair the damages sus *49 tamed b.y the brig on the voyage to Shanghae was in part or in whole the moving and efficient cause of the foundering of the brig.
There was also a request to charge that the prelimiuary proofs were insufficient; but as this involved the same grounds as the other requests, it need not be considered separately. All such requests were denied, and exceptions taken to the denial.
Several exceptions were taken, at the trial, to the introduction, as evidence, of the contents of the certificate of a survey made of the brig by a surveyor for Lloyds (Bung,) and a ship-master, (Anderson,) at Woosung, on the 1st of March, 1854. This certificate stated the following facts or conclusions:
1. That the brig had not received any material injury, made but little water, showed no signs of weakness in her butts and fastenings, but was prevented from taking cargo by the loss of her falsó keel and a good deal of her copper.
2. That there was nothing to prevent her from proceeding to Hong Kong in ballast; which, considering the difficulty of repairing her at Woosung, owing to the number of vessels then undergoing repairs, was without doubt the best course to pursue for all parties concerned.
3. That no further repairs were required at Woosung than putting up her cabin and forecastle fittings temporarily, (as it was necessary for the crew to proceed in her,) as they considered the vessel quite safe to proceed to Hong Kong, there to undergo the repairs necessary to make her fit to carry a perishable cargo.
The defendants objected to the introduction of the statement in such certificate respecting the freedom of the brig from injury; the absence of obstacles to her voyage to Hong Kong in ballast; the expediency of taking that course; the absence of any necessity for repairs, and the safe character of the voyage.
The fact of the survey, as well as that the certificate before mentioned was a copy of the report of the surveyors, was admitted, and it was agreed that the statements in *50 such report should have the same effect as evidence, as if sworn to on a commission, subject to the same objections.
The objection to the statement of the surveyors as to the condition of the vessel, the necessity of repairs, and the propriety and safety of returning to Hong Kong, was, that they were matters of opinion, and that it is not established that such surveyors were experts in the matters testified to. Even if this were so, such a view overlooks the character and position of the parties giving the advice, the object of obtaining it, and the duty of the party receiving it. The master of the brig, in the exercise of due diligence and discretion, and in order to discharge his duty of deter-» mining what ought to be done with his vessel, consulted a ship-master and the surveyor of a board of underwriters, as competent persons as could have been obtained, to examine its condition and advise what course he ought to pursue. Their opinion and advice were certainly material upon the points of consultation; although it may not be conclusive as matter of either judgment or fact, a survey containing even “ the opinion of men of sound judgment, intelligence and skill in naval affairs,” is always important in deciding the propriety of the master’s conduct. (Potter v. Ocean Ins. Co., 3 Sumner, 42.) It so happens that in this case the surveyors accompanied their opinion upon each point by the facts upon which it was built. Thus, in regard to the injury to the brig, they say she makes but little water, and shows no sign of weakness in her butts and fastenings, although prevented from taking cargo by the loss of her false keel and a good deal of her copper; that a return to Hong Kong was the best course, because there would be great delay in being repaired at Woosung; that there was nothing to prevent, such return, no further repairs being necessary; and finally, that the vessel was quite safe to go to Hong Kong. Unless, therefore, the rule of law be not merely that the master of a vessel should do what seemed best, after the exercise of due diligence and sound discretion, for the interest of owners and underwriters, but that he is bound to do what may, after *51 subsequent events have occurred and further knowledge been obtained of the state of affairs, out of the reach of the master at the time, turn out to be the best, the opinions of skillful surveyors, given on consultation, should have great weight. (Fontaine v. Pheonix Ins. Co., 11 J. R., 293.) This piece of testimony being admissible for one purpose, the defendants’ counsel, if they wished the jury not to consider it for another, should have requested the judge to warn the jury not to give too great effect to it as evidence of facts. Even if the surveyors were not technically experts, they were experienced to a certain degree in the matters as to which they testified; and the conduct of a master might be justly suspected who assigned as a reason for not consulting any one, that he could not find a thorough expert. There are facts, the results of or conclusions from a combination of other facts incapable of minute description, to which persons of even ordinary experience have a right to testify, (Dewitt v. Barly, 17 N. Y. R., 342 ; Clarke v. Baird, 5 Seld., 196,) and particularly when, as in this case, they are negative, to wit, no sign of injury to the brig; no obstacle to her return without repairs; and no danger on the voyage. The whole of the report in this survey was, therefore, properly admitted in evidence.
The first question arising on the merits, as made by the defendant’s counsel in his requests to charge, was, whether the loss of the vessel was attributable solely to perils insured against, or whether it was caused partly by acts or omissions, against whose result the underwriters did not undertake to insure. It is insisted on the part of the defendants that the brig, when she set sail from Woosung on her return to Hong Kong, was not seaworthy, or to use the words of the counsel in his request, was in an unfit and insufficient condition for the voyage; and that such unfitness and insufficiency was established: First, By the presumption as to her condition when she arrived at Woo-sung, growing out of the storms and accidents she had previously encountered, and by the actual injuries to her *52 by such perils, as they were proved; and Secondly, By the briefness of the time and insufficiency of the hardships encountered after leaving Woosung, to account for the destruction of the vessel in the manner in which she perished. The jury found by their answer to the first question put to them that the brig, when she sailed from Woosung to Hong Kong, was in a suitable condition to make it safe for her to undertake the voyage in ballast. Assuming such to be the extent of seaworthiness necessary on a time policy, it is clear, that unless the evidence was either not such as to confer on the jury the right of passing upon such question, or wholly failed to support such finding, their verdict must be taken as conclusive.
The material incidents of the brig’s voyage to Woosung were as follows: From the 5th to the 20th of February she had heavy weather, during that time carrying away the foretop-gallant -yard, and the foretop-mast staysail and jib. After coming to anchor on the 21st in three and a half fathoms water in half an hour she went ashore; a piece of the false keel came up alongside, and she was then making water fast, the pumps continually going and the vessel thumping hard; the flood tide commenced making and in two hours had run into -and filled the ship which had stuck fast in the mud; the main hatches burst off, and after pumping for a day the ship refilled; a steamer broke two hawsers in the attempt to tow her off and left; finally when the tide rose the brig floated, and was got under sail on the 26th. She grounded once, but then made no water, although subsequently, on the first of March, the vessel was noticed to make thirteen inches of water in twenty-four hours; the surveyors state that she .then made no water and showed no signs of weakness either in her butts or fastenings, although the false keel was off and a good deal of copper. The only damage, therefore, attributed to these perils is the loss of spars and sails, to wit: foretop-gallant yard, foretop-mast stay-sail and jib, of the false keel and some copper; the false keel being no part of the hull, but only added to prevent *53 the ship from going to leeward when on the wind, and to protect her real keel and copper from injury. (Young’s Naut. Dict., 176.) Whatever strain the hull of the vessel might have undergone from the winds and waves she encountered, it was not visible, and all the other facts which occurred could not by any reasoning a priori establish unseaworthiness at Woosung: any presumption, therefore, as to her weak condition at that place is not sustained either by previous occurrences or any actual visible injuries to her.
The incidents of the voyage from Woosung were as follows: On the next day after the brig’s departure she encountered strong breezes, and four hours afterwards came to anchor in eight and a half fathoms water; during the night the breezes increased to gales; the vessel was pumped every half hour until midnight, and every two hours afterwards; the next day a fresh breeze sprang up, the ship beginning to leak, and seven hours afterwards, the leak gaining, sail was again set; the leak still gaming the ballast was thrown overboard at midnight; the wind blowing furiously, and the ship being one-third full of water; the press of canvas made her leak more, when sail Avas shortened and the vessel made for the place where she was finally lost; being half full when she anchored, she filled in seven hours. It Arould seem, therefore, that she was exposed for a night at anchor in eight and a half fathoms water to gales, during which she sprung aleak so as to require pumping every half hour; that the next day on the wind increasing, the leak increased; that the master attempted to carry sail to get her away, but the fury of the wind, adding to the press of the canvas increased the rapidity of the leak and she finally fell a victim to it. Under this statement of facts, it would not be necessary in order to sustain the verdict for the Oourt to pronounce upon the seaAvorthiness of the vessel, it being clearly not impossible that such calamities might destroy even a seaworthy vessel; for it is only upon such an impossibility that the defendant’s counsel would be justified in asking the Court *54 to hold, the vessel could not have been seaworthy because she was destroyed by such perils. In delivering the opinion of the court in Wright v. Orient Mutual Insurance Company, (decided in 6 Bosw., 269,) I had occasion to examine the question whether a speedy loss of the vessel by perils not sufficient to account for her destruction, if she were seaworthy, was a question of fact or law, and I then undertook to analyze the decisions in the three cases horn Dow’s Parliamentary Oases, cited by the defendant’s counsel on the present argument, (Watson v. Clark, 1 Dow’s Parl. C., 344 ; Douglas v. Scougall, 4 Id., 269 ; Parker v. Potts, 3 Id., 23,) as well as the cases. in our own reports, which followed them ; I then came to the conclusion that prima facie it was a question for the court to decide whether enough peril had been proved to carry the case to the jury, but that after that it became a question of fact, whether the greatness of the injury and the smallness of the peril combined, established unseaworthiness. I have had no reason since to change my views on that point. (See McLanahan v. Union Insurance Co., 1 Peters, 184 ; Patrick v. Hallett, 1 Johns., 241 ; S. C., 3 Johns. C., 76.) I think upon the principle then established the evidence in this case was sufficient to go to the jury, and that their finding upon that point ought not to be disturbed. (Sherwood v. Ruggles, 2 Sand., 55.)
But even upon the supposition that the causes testified to were inadequate to destroy the brig if she had been in a complete condition of seaworthiness, the plaintiffs might still be entitled to recover. It has been held in the highest Oourt of our State that in a time policy, either for a fixed period or an entire circuitous voyage, touching at ports, or a round voyage out and home, there is no warranty of seaworthiness at any port but that of departure, and therefore, a failure to repair at an intermediate port, does not discharge the insurer horn loss not arising from such failure. (American Ins. Co. v. Ogden, 20 Wend., 287, affirming Ogden v. American Insurance Co., 15 Wend., 532.) The same principle is adopted in Massachusetts, (Capen *55 v. Washington Ins. Co., 12 Cush., 517.) The English cases g’O still further; in the suit of Small v. Gibson, brought on a time policy, it was held in the Exchequer Chamber on error to the Court of Queen’s Bench, that no warranty of seaworthiness attached even at the commencement of the term, (3 Eng. Law and Eq., 290, 299,) and that principle was affirmed on appeal to the House of Lords, (Gibson v. Small, 24 Eng. Law and Eq., 16 ; S. C., 17 Jur., 1131 ; 4 H. Lords C., 353,) two eminent Judges, (Lords St. Leonard and Campbell,) taking occasion to distinguish between time and voyage policies. . A similar principle was reiterated afterwards in the cases of Thompson v. Hopper and Fawcus v. Sarsfield, (6 El. & Bl, 172, 199 ; S. C., 34 Eng. Law and Eq., 266, 277,) and Jenkins v. Heycock, (8 Moore’s P. C. R., 351.) In Small v. Gibson it was held in the Exchequer Chamber that “the word seaworthy did not necessarily mean a state completely fit for sea navigation, but included in it a fitness for present navigation, either on a sea or river, if about to sail or sailing on either, and a condition of repair and equipment for the port” in which she might be; in this case the contemplated voyage was on the river; Yang-tze-kiang, and she was well enough equipped and repaired to induce the crew to trust their lives in her. But the policy having once began to run, the management, condition and care of the vessel subsequently became entirely a question of good faith and diligence on the part of the master. As the insurers are not liable for any negligence of his not amounting to barratry (Grim v. Phoenix Ins. Co., 13 J. R., 451) ; so the exercise of reasonable skill and ordinary caution, diligently and in good faith on his part, leaves them liable. (American Ins. Co. v. Ogden, 20 Wend., 294 ; Starbuck v. New Fngland Ins. Co., 19 Pick., 198, and the cases before cited of Thompson v. Hopper and Fawcus v. Sarsfield.) A mere error of judgment on his part does not exonerate them, (Dixon v. Sadler, 5 Mee. & Wels., 405 ; S. C., 8 Id., 898 ; Redman v. Wilson, 14 Id., 476,) nor does even the fact that greater precaution in the equip *56 ment might have prevented the loss (Redman v. Wilson, ubi sup.) These principles coincide with those laid down by Lord Campbell in Thompson v. Hopper, (38 Eng. Law and Eq., 39,) by Senator Verplanck in the case before cited of American Ins. Co. v. Ogden, (ubi sup.) and by Chief Justice Shaw in Capen v. Washington Ins. Co., (ubi sup.) Hone of the requests to charge in this case embrace any question of good faith, diligence, skill or caution to be left to the jury; all of them, besides assuming the previous damage, to have been the cause of the loss, require the Court to pass upon the master’s duty, and insist that if the neglect to repair was the cause of the loss, the defendants are not liable. Such a principle is adverse to the doctrines laid down not only in Redman v. Wilson, (ubi sup.) but also in Waters v. Merchants’ Louisiana Insurance Company, (11 Pet., 218 ;) Mathews v. Howard Insurance Company (1 Kern., 20 ;) , Copeland v. New England Marine Insurance Company, (2 Metc., 435,) and Wilbraham v. Wartnaby, (2 Arn. on Ins., 774.) The place where the vessel lay when she started on her return voyage, was not a port in her previous voyage; it was one of distress; the conduct of the master then is to be judged of as if his vessel were on high seas; if he discharged his duty with fidelity, diligence and moderate caution and skill, the whole of the consequences of his conduct, even if in bad judgment, are not to be visited upon the assured, who never became guarantors for his consummate skill and judgment or final success. ...
It is not necessary in this case to dispose singly of all the criticisms upon the conduct of the master made by the defendants’ counsel; they did not place themselves in a position to have such criticisms passed upon by the jury, by calling upon them to decide even whether the master did the best under.all the circumstances, much less whether what he did was characterized by bad faith or negligence. Ho evidence was furnished to show that a more thorough examination of the vessel would have done more or even could have been had than that which was made at Woo- *57 sung, or to throw doubt upon the fact stated by the surveyors, that there was no visible material injury to the vessel. The jury found by their answer to the second question submitted to them that the examination was careful; and the law does not require the utmost care of which the case was susceptible, it is contented with that degree which is inconsistent with bad faith. The second and fifth requests to charge, as to the total loss, required the Court to pass upon the cause of it. The third and fourth besides assuming what was in controversy, to wit: Whether the damage on the previous voyage was the cause of the loss, and that repairs could have been made , at Woosung, can only be sustained upon the theory of a warranty of seaworthiness, in which situation the fifth is also placed. So far as any of them assumed it to have been the duty of the master, at all events, to restore the ship completely to her former condition, and make the repairs at Woosung necessary to enable her to carry cargo and so far as the seventh made the omission to repair, if the cause of the subsequent injury fatal to the plaintiff’s claim without regard to the good faith or diligence of the master, they were unwarranted bylaw; the refusal, therefore, to give the instructions asked for was proper. This finishes the consideration of the most important branch of this case, as the finding of the jury upon the first question determines the plaintiff’s right to recover, and the question raised, on the sufficiency of the preliminary proofs is governed by the same principles.
On the trial the defendants objected to the recovery of any particular average because the items of such average, attributable to the perils insured against, and with which they would have otherwise been chargeable, did not amount to one-twentieth of the value of the subject insured; they also objected to the recovery of certain items included in the general average, and claimed that the freight was chargeable with a portion of those which were chargeable.
There was no evidence in the case that any adjustment of either particular or general average ever took place. A *58 statement was introduced on the trial, and appears in the case, in regard to the items contained, in which certain admissions were made hy stipulation between the parties. Ho other weight is to be given to such statement, or anything contained in it, than such admissions warrant. Such admissions were substantially as follows: 1st. That the master of the vessel necessarily incurred the expenses set forth in such statement, in order to get the brig afloat, in making repairs at Woosung, procuring supplies and paying the crew. 2d. That the items in such statement for cargo lost overboard and destroyed, during its discharge, were so lost and destroyed unavoidably. 3d. That the term “fittings,” used therein, meant furniture, bedding, chairs and the like, and not work or repairs upon the vessel. 4th. That the freight of the brig for the voyage was paid in advance. 5th. That the master obtained money from a firm at Shanghae to defray such proportion of such expenses as was properly chargeable to such brig; and the plaintiff has since repaid the same, with just commissions and charges added thereto, amounting to a certain per centage. But such admissions were accompanied with the reservation of the question of the propriety of making such items part of either general or particular average, and also subject to the question of the obligation of the freight to contribute to. the items of general average, properly chargeable as such.
On the trial the plaintiffs claimed as items of particular average, the whole of the surveyor’s fees on the hull; two-thirds of new ensigns and charts, and fittings for the forecastle of the brig; the whole of the temporary repairs to enable the vessel to return to Hong Kong; pilotage to sea, at Woosung; wages, board and medical attendance on the crew; stores to replace those destroyed and to enable , the vessel to proceed to Hong Kong; expense of noting the second protest, and commissions on disbursements. On • the argument, the plaintiff’s counsel increased his claim over and above the cost of repairs, stores and ascertainment of damage, from two-thirds to the whole of the cost *59 of the new ensigns, charts and fittings, while he abandoned any claim for money paid for pilotage, board and medical attendance; the result of which was, that, unless he was entitled to the whole of such cost of such equipment, his damage would not have amounted to five per cent. The statement in which but two-thirds were claimed was part of his preliminary proof of loss furnished to the defendants. I have been unable to find any warrant for exempting the supply for the use of the vessel of new articles, instead of old, from the rule of deducting one-third, when the question is as to the cost of repairs. I, therefore, think that the items claimed on the hearing did not make out a sufficient particular average upon which to recover.
The plaintiff will not be in any better condition by claiming the items of particular average insisted upon at the trial; the expense of the wages and board of the crew, and provisions, unless incurred to complete an unfinished voyage, and thereby earn freight, is not a subject of such average. The statement before referred to, which forms part of the preliminary proof, makes such expenditures a subject of general average, and they were included in the claim therefor. It does not appear by it, however, whether any part of such wages was paid for extra labor by the crew on the vessel when aground, which might possibly render them a subject of particular average; if paid for the detention at Woosung, they were hardly even part of the general average, according to the principle of Dunham v. The Commercial Insurance Company, (11 J. R., 315,) which has been since extensively approved and followed. In that case, where a vessel previously injured by storms had arrived at its port of destination, and there delivered its cargo, the expenses to be recovered were limited to those incurred before arriving at such port, necessary for the prosecution of the voyage and preservation of the cargo and freight, as well as vessel; and the wages of the master and crew, and the cost of provisions at such port of destination, during the detention of the vessel there for repairs, *60 were held not chargeable upon the underwriters as subjects of general average. This principle may also be found laid down by Mr. Phillips, (Vol. 2, § 1429,) and has been adopted in Connecticut, (Sage v. Middletown Ins. Co., 1 Conn. R., 239,) and Ohio, (Perry v. Ohio Ins. Co., 5 Ham., 306 ; Gazzam v. Cincinnati Ins. Co., 6 Id., 73.) In the latter it is extended to extra labor in the navigation of a disabled vessel. (Webb v. Protection Ins. Co., 6 Ham., 456.) The contrary to which is held in Massachusetts. (Hall v. Ocean Ins. Co., 21 Pick., 472.)
In this case each passage was made, by the policy, a subject of separate average. Woosung was undoubtedly the termination of one passage, as the cargo was delivered there, and the vessel never went any further on her originally contemplated voyage. The expenditures in question, therefore, must, beyond the repairs of the damage done, have been incurred to' fit the vessel for her return voyage, and could not have been for the outward voyage from Hong Kong. The claim, therefore, for wages, board and provisions was not much pressed on the hearing, probably for these or other good reasons. Upon the claim for partial loss, therefore, the defendants are entitled to judgment, and the verdict should be reduced by that amount.
The sums awarded to a pilot for extra services in attempting to get the brig afloat, when grounded, and those paid for labor and the use of vessels employed for the same purpose, form proper subjects of general average, because necessary to enable the vessel to pursue her voyage, and should be allowed. Articles unavoidably lost overboard and destroyed in discharging the cargo, this being the necessary consequence of an act done to benefit all parties, are also subjects of general average.
The freight on the brig was paid in advance, and, although in the absence of evidence of a right to retain it being part of the original contract, it may be payable back, (Phelps v. Williamson, 5 Sandf. S. C. R., 578,) there is no evidence in this case whether the freight was earned *61 or not, or whether the cargo was delivered and accepted at Woosung or not. It is impossible, therefore, to tell whether the corpus ever had an existence in the shape of freight actually earned and payable, to whose safety and acquisition the expenses on the voyage, constituting part of the general average, contributed. ■ It must, therefore, be excluded as a contributory interest, and the general average be wholly paid by the vessel and cargo.
The verdict, therefore, should be reduced by the amount of the partial loss, and judgment rendered for the plaintiff for the reduced amount, with his costs, at special term; neither party to be allowed costs on the motion for a new trial or on the appeal.
By the Court—Hoffman, J,
In determining what principles of law govern the present case, it is of importance to notice, that by the now settled law of England, there is no implied condition or warranty of seaworthiness in a time policy.
The head note of the case of Gibson v. Small, in the House of Lords, (24 Eng. L. and Eq. R., 16 ; 3 House of Lords Cases, 352), is this:
“ Time policy in the usual form, on the good ship Susan, lost or not lost, in port and at sea, in all trades whatsoever and wheresoever, during the space of twelve calendar months, commencing on the 25th of September, 1843, and ending on the 24th of September, 1844. To an action on the policy the underwriter pleaded, that the ship was not, at the time of the commencement of the risk in the policy mentioned, nor at the making of the said insurance, nor on the 25th of September, 1843, seaworthy.”
Held, that the plea was bad in law.
“ In a voyage policy, the law implies a condition of sear worthiness, but no such condition is implied in regard to time policies.”
Semble. “ If, however, a ship be about to sail on a particular voyage, and a time policy be effected instead of a voyage policy, I think, as at present advised, that the con *62 dition of seaworthiness at the commencement of the voyage, would be implied.” (Per Lord St. Leonards.)
Sed contra. “As at present advised, I should decide against the implied condition in all cases of time policies, and should be glad if it were understood, that in all voyage policies, there is, and in no time policies framed in the usual terms, is there, a condition of seaworthiness implied.” (Per Lord Campbell.)
This decision was in 1853.
In 1856 two cases came before the Court of Queen’s Bench, Thompson v. Hopper and Fawcus v. Sarsfield, (34 Eng. L. and Eq. R., 266 ; and Id., 277,) involving the questions referred to by the learned lords.
The result of these cases is, that Lord Campbell’s doctrine is sustained in its utmost extent; that there is no difference because the ship is an outward bound vessel, lying in a British port, and where her owners reside, and was sent to sea in an unseaworthy condition from that port; that the rule of there being no implied warranty of seaworthiness in a time policy, applies equally, whether the ship, at the commencement of the risk, be at sea on her voyage, or be, at the date of the policy, in a port about to sail on a voyage, where there are means of making her seaworthy.
In the case of Jenkins v. Heycock, before the Privy Council, (8 Moore’s Privy Council R., 351,) the Judges intimated a strong opinion in favor of the rule of Lord Campbell, in its broadest, comprehension.
This rule has been adopted to a considerable extent by the supreme court of Massachusetts in the case of Capen v. The Washington Insurance Company, November 24,1853, stated by Mr. Phillips, (vol. 1, p. 409, ed. of 1854, reported 12 Cushing, 517.)
The policy was upon a vessel then at sea, for one year. She arrived at Boston, her home port, then made a passage to Norfolk, and took a cargo for Sicily. Being found after sailing, unfit to proceed by reason of the weakness and defectiveness of her timber, she put back to Savan *63 nah, where it was found that she required extensive repairs, to procure which she sailed with a light cargo for Yew York, where the repara would cost less than at Savannah; and on that passage was burnt.
The examination at Savannah showed that the condition of her timbers was such, that she would have required, within the year, great repairs to fit her for carrying the usual cargoes, on the usual voyages of vessels of her class.
Chief Justice Shaw stated the opinion of the court to be, “ that there was no warranty of seaworthiness in the strictest sense of the term, but that the only implied condition is, that the vessel is in existence as a vessel, at the commencement of the risk, capable of being made useful for navigation, and in a safe condition, whether at sea or in port; and is seaworthy when she first sails; or, if she is at sea, that she had sailed in a seaworthy condition, and is safe.”
In the leading case in our own courts, (The American Insurance Company v. Ogden, 15 Wend., 535 ; 20 Id., 287,) it is assumed that there is an implied warranty of seaworthiness in a time policy, and it is expressly decided that this implied warranty is complied with, if the vessel be in a seaworthy condition at the commencement of the risk; that it is not requisite she should be seaworthy at the beginning of each successive voyage or passage during the continuance of the risk, and that if the vessel, subsequently to the attaching of the risk, sustain damage, and is not properly refitted at an intermediate port, the insurer is liable for a future loss, unless the same is the result of that omission to refit and that has arisen from bad faith or want of ordinary care and prudence.”
In Van Valkenburgh v. The Astor Mutual Insurance Company, (1 Bosw., 61,) heard before the present Chief "Justice, Boswobth, and Hr. Justice HoppjMas, there was a voyage policy upon goods. The risk was “ at and from Yew York, by steamer or steamers, to Chagres; at and thence by the usual conveyances across the isthmus; at and thence by steamer or steamers to San Francisco.” Hr. Justice Bos *64 worth held that there was an implied warranty of seaworthiness of the vessel at Hew York for Ohagres; that there was equally an implied warranty of any steamer used on the Pacific side of the isthmus to San Francisco; and he thought that it should be equally applicable to any vehicle of conveyance across the isthmus. Justice Hoffmaft doubted whether there was any implied warranty of seaworthiness in the boats employed for the transfer across the isthmus. Both judges concurred upon another point, which decided the cause.
It is obvious that here were voyages designated in the policy itself as distinct and separable. Mr. Justice Bosworth’s doctrine may be unimpeachable, and not in the least affect the present case adversely to the plaintiff.
It may be suggested that there is, perhaps, nothing in The American Insurance Company v. Ogden, which would prevent our highest tribunal going to the full extent of the English law upon the subject of an implied warranty of seaw'orthiness in a time policy.
But assuming the law of our State to be as it is supposed to be in that case, and in the case in Massachusetts, the facts in the present instance exclude the idea of such a warranty at the time of the vessel’s departure from Woo-sung. The risk attached on the 22d March, 1854. Where the vessel then was, or what was her then condition, does not appear; but on the 5th of February the risk remained attached, on and for a voyage from Hong Kong to Shanghae, and back to Hong Kong. This was the passage then undertaken, a passage separate within the sense of the policy from any previous passage, or any future one, had she performed it and undertaken another within the period of the running of the policy.
I cannot doubt that the assured are entitled to the assumption that the vessel was seaworthy at the commencement of the risk undertaken, viz., the 22d of March, 1854, and at the date of this distinct passage or adventure, viz., the 4th of February, 1855. The general and strong remarks of Mr. Justice Duer, in Moses v. The Sun Mutual *65 Insurance Company, (1 Duer, 159,175,) must be understood as applicable to voyage policies, or must be received with qualifications which will prevent their governing the present case.
. To my mind it is, therefore, clear, that when this particular voyage or passage began, either the implied warranty of seaworthiness had been fulfilled and exhausted by previous employment of the vessel from the time the policy took effect, or must be assumed to have been complied with and discharged when she sailed on the 4th of February. When, then, the voyage was interrupted by the accidents which drove her into Woosung, when she began to retrace her way to Hong Kong, and from that time until her destruction, there was no period at which an implied warranty of seaworthiness had existence.
The ground of defense, taken in the answer, of unseaworthiness when the vessel left Woosung, as far as it depends upon implication of a warranty, therefore, fails.
The exemption of the defendants can only rest upon the other ground taken in the answer, viz., the negligence or fault of the plaintiff or his agents. Unseaworthiness in this aspect of the case is an element, and one of no little moment, in testing the question, although it is not a condition.
Few cases are of more value in determining the true nature of such a defense, and what must be established to support it, than that of Thompson v. Hopper. In that case, the third plea was, that the plaintiffs, after the making of the said policy, knowingly, willfully, wrongfully, and improperly, sent the said ship so loaded out to sea, in an unseaworthy state, and when she was not fitted for the voyage, and when she was not in a fit and proper condition safely to go to sea, and at a time when it was dangerous for the said ship to go to sea in the state and condition in which she then was; that they permitted her to remain on the high seas, near the sea-shore, for a great length of time, in such state and condition, and without a master, and without a proper crew to manage and navigate on her *66 said voyage; during which time the said ship, by reason of the premises, became and was wrecked and wholly lost.
This plea was held good on demurrer, in an action on a time policy on the ship. Lord Campbell said: “Here we have personal misconduct charged tipon the plaintiffs, which misconduct produced the loss. It is a maxim of our insurance law, and of the insurance law of all commercial nations, that the assured cannot seek indemnity for a loss produced by. their own wrongful act. According to the statements in this plea, the plaintiffs efficiently caused the loss by their own wrongful act; and if so, I think there was no necessity expressly to characterize that act as being either felonious or fraudulent.”
The issue which was taken on this plea came on after-wards to be tried, a verdict was rendered for the plaintiff, and a motion made for a new trial. (Thompson v. Hopper, 38 Eng. L. and Eq. R., 39.) Lord Campbell, in delivering the opinion of the court, enters into the question of what neglect constitutes an efficient cause of the loss, at great length and with great care. “ The question seems to be, not whether the wrongful act or neglect of the assured was the proximate cause, causa causans, of the loss, but whether it was a cause without which the loss would not have happened—whether the loss was fortuitous, or whether it was incurred, or occasioned by, or proceeded from, the wrongful act or neglect of the assured. The jury are clearly to see that without this act or neglect, the loss would' not have happened; .or they cannot say the assured induced or occasioned the loss, and the under-, writer will be held liable, the proximate cause being a peril for which, by the policy, he is liable.”
This corresponds substantially with the propositions of Senator Vebplahok, in The American Insurance Company v. Ogden, [ut supra.) After stating that the condition of seaworthiness is strictissimi juris, and goes to the foundation of the contract; but that, when it has once attached, it is of no further obligation, he'says“ Any defect of sea *67 worthiness arising afterwards from bad faith, or want of ordinary prudence or diligence in the owner or his agents, discharges the underwriter from liability for any loss occasioned by, or the consequence of such want of faith, prudence, or diligence, but from no others.”
The elaborate and careful opinion of Chief Justice Shaw, in the case of Capen v. The Washington Insurance Company, before cited, states rules less rigid and more favorable to business than those of Lord Campbell ; but such as I think would equally free the assured in this instance from such a neglect as will discharge the underwriters.
The jury have found that the brig was in a suitable condition to undertake the voyage from Woosung to Hong Kong in ballast; it was safe for her to do so; and that the master, after a careful examination in good faith, did judge it safe, and for the interest of all concerned to do so. If these conclusions are not against admitted evidence, and if no evidence, which bears upon them, has been improperly admitted, then, with the general verdict, a case is made out fully within the principles of law I have-stated.
The question is, was there bad faith, or gross neglect, or want of ordinary produce-? The answer of the jury p exempts the master from either, and justifies him in resorting to a port where repairs could be obtained to fit his vessel for resuming her employment in carrying cargoes.
And I think it quite clear, that these findings are not against the evidence permitted to go to the jury. The learned counsel of the defendant has, in his third point, stated various grounds for the position that they are contrary to evidence. One of them should be noticed.
There was no affirmative evidence that the master examined the brig at all. But the question to the jury does not necessarily import a personal examination by the master. It. adopts the language of the survey, and may be read the careful examination of the surveyors. That the survey was known to the master, is to be assumed. It was made at his request. That he judged it safe to proceed, is to be drawn from the reliance he was authorized *68 to place upon the survey, and from, the fact of his proceeding.
The next, and a very important question upon the general rules of evidence on this subject is, whether the learned judge has committed any errors at the trial in the admission of testimony. This inquiry deserves much attention in cases of a maritime character, which admit, in my judgment, of some material distinctions as to rules of evidence.
The survey was an important piece of testimony produced in the cause. In that it was stated as follows:
“We do consider that the brig has not received any material damage.” “There is nothing to prevent the vessel from proceeding to Hong Kong in ballast, which is, without doubt, the best course to pursue for all parties .concerned.” “ But no further repairs are required here, as we consider the brig quite safe to proceed to Hong Kong.”
To each of these statements an objection was taken, that they ought not to be read to the jury. They were all .admitted, and an exception to the ruling in each case was taken.
These statements are made by King, the surveyor to Lloyds, and by Anderson, master of the ship Mastiff
By the stipulation of the parties, the statements in this survey are to have the same effect as evidence, as if regularly deposed to under a commission, and be subject to the like objections as if so deposed.
It is therefore the most favorable view for the excepting .party, to suppose these points made the subjects of questions at a trial, objected to, and admitted under exceptions.
It is true, as observed in Dorr v. The Pacific Insurance Company, (7 Wheat., 581,) that, in the abstract, “ a certificate. of survey is not legal evidence, because the examination of surveyors themselves would be better.” We have ‘here that examination. But the proposition itself is by no means clear.
A “ survey,” says Mr. Justice Story, in the case cited by Mr. Reed, “is a common public document, looked to by *69 both underwriters and owners, as affording the means of ascertaining upon the very spot, at the very time, the state and condition of the ship and other property at hazard.” (3 Sum., 42.)
In Fontaine v. The Phoenix Insurance Company, (11 John., 293,) Ohief Justice Kent charged a jury that the surveyor had certified the vessel ought to be sold; that such certificate was not conclusive; but if made hona fide, it was strong evidence. Presuming it to be an honest survey, it stated that the vessel could not be got off and repaired for half her value; and if that was so, the loss was total. Mr. Emmet, on a motion for a new trial, urged that the survey was very loose and unsatisfactory. There are no facts from which there could be formed a correct opinion. The surveyors give merely their own broad opinion, without stating facts. All that the court say is, that upon the other points it was inclined to think the cause was with the plaintiffs. There was one, however, that was decisive against them, and on that the determination proceeded.
In the case of the Henry, (1 Blatch. & How., 465,) Judge Betts examines the office and nature of a survey. The wise precaution of the maritime law has pointed to one item of proof, which, if not necessary, will nevertheless be demanded, unless its absence be satisfactorily accounted for. That is, a precedent examination of the véssel by competent surveyors, and their report stating her condition, and advising a sale. A survey by competent surveyors, containing a clear statement of the injury, and a strong recommendation to sell, will be an important element in the proofs in determining the character of the emergency, and especially the good faith of the master. It is not intended to be laid down as a fixed rule, that the surveyors must be sworn before they proceed to act. Still it adds greater weight and credibility to their decision, if their examinations are under the solemnity of an oath. See also Idle v. The Royal Exchange Assurance Company, (8 Taunt., 755,) and Hale v. The Franklin Insurance Company, *70 (9 Pick., 466.) The admiralty and the general commercial law does thus attribute to a survey a peculiar weight as a piece of testimony, and does sanction the opinions and conclusions of the surveyors as admissible without the rigid limitation to the statement of facts exacted from witnesses in ordinary cases. This may be on the same principle as governs the rule as to the opinions of experts.
I cannot doubt that every statement in this survey, being upon oath, is admissible evidence; that a direct question tending to elicit an answer containing such statement, would be sustained on exception.
• These views cover and meet all the points of the learned counsel of the defendants on this part of the case.
2. The next branch of the cause relates to the adjustment of the partial loss and general average.
It is insisted that the plaintiff cannot recover for a partial loss because the items properly chargeable as particular average, deducting one-third new for old, did not amount to one-twentieth of the insured value of the brig, which would be the sum of $1,000. By the policy, no partial loss or particular average was to be paid, unless amounting to five per cent.
It is to be remembered that the damages sustained, for which this loss was incurred, arose while prosecuting the outward portion of one continuous voyage; that Woosung was a port of distress, and that the expenses there incurred were to fit the vessel for the return, which, we must assume, was the most prudent course. But that voyage was broken up. The brig returned in ballast. The cargo, it is to be inferred, was landed at Woosung.
The consent of counsel excludes from the evidence the American consul’s certificate of the office and qualifications of the gentlemen who made the settlement of the loss. We cannot therefore give legal credit to the document as an official adjustment of losses at a foreign port, (Strong v. The New York Firemen's Insurance Company, 11 John. Rep., 323 ; Benecke, p. 273.)
*71 The items of partial loss in the statement amount to $1,487.24, thus made up:
| of $415.75, items i off,................... $277 17
Bepairs,.................................. 42 50
Pilotage from Woosung,................... 50 00
Wages,...........................$411.50, 233 50
Do. and medical attendance,................ 178 00
Stores to replace those totally destroyed, and to
enable the vessel to proceed to Hong Kong, 600 80
Half surveyor’s fees,....................... 32 00
' Hospital fees,............................. 19 00
Consulate and protests,..................... 18 00
Commissions, 2§ per cent,.................. 36 27
$1,487 24
The disaster happened on the 21st of February, by the vessel running ashore. On the 26th she was at anchor, and the men were set to work cleaning her up. On the 1st of March the survey was made, and she sailed for Hong Kong, on the 10th.
The master obtained money from Bull, Nye & Co., of Shanghae. The vessel was finally lost and abandoned on the 10th of March, and the crew arrived at Shanghae about the 14th of that month.
The accident which compelled the vessel to run into Woosung for repairs, gave rise to subjects of general, as well as particular, average. The payments for services of the steamer Confucius and to Anderson were of the former character, and we do not know that any mistake has been made in carrying to that account all that has been so carried.
By the rule which seems to prevail in the United States, some portion of the expenses attending the detention, that is, of wages and provisions, could have been chargeable in general average. Up to the time of the decision to break up the voyage after the cargo was landed, the common interest to have the repairs made-for the prosecution of the voyage, would form a case for contribution. The *72 date of the survey was probably the extent of the period to which such allowance could be made, being about nine days. We may presume that the amount would have been small. (Bixby v. The Franklin Ins. Co., 8 Pick, 86 ; 3 Sumn., 510 ; Id., 27 ; Nelson v. Belmont, 5 Duer, 310, 325 ; Dunham v. The Com. Ins. Co., 11 John., 315 ; Barnard v. Adams, 10 Howard U. S. R., 270, 307.)
A ship with a cargo on board is compelled, by a peril which induces a loss, the subject of general average, to go into a port of distress. She requires repairs, and they are furnished. The expenses for wages and provisions, during the detention, being a given sum, that sum is rightly made the subject of a general average. The reasoning would seem quite just that, had the ship been in ballast, the same expenditure would have constituted particular average.
But the English rule is explicit, that “ the provisions and wages during a detention, the expenses of which belong not to general average, cannot, according to the nature of the subject, be considered a particular average, at the charge of the underwriters upon the vessel, but must be paid out of the freight.” (Benecke, of Average, 158 ; 2 Arnould, 850, 910 ; and Eden v. Doole, cited in Park on Ins., 117, 8th ed. ; Devaux v. Salvador, 4 Adol. & El, 420.) The question distinctly arose in the last case, and was decided by the court of King’s Bench unanimously. Lord Denmah adverts to the passage in Mr. Abbott’s work, (on Shipping, 350, 5th ed.,) in which he speaks of such expenses being in the nature of an accessory to a principal, and says: “ This is confined to the question of contribution which may exist'between the owners and the freighters, and does not in any wise relate to the demands which may be preferred against the underwriters. It therefore furnishes no proof that he differed from the doctrine above alluded to.”
Mr. Benecke states the reason of the rule thus: “ Indeed, as the underwriter on the ship guarantees only the safety of the ship, and as he has consequently nothing to do with the longer or shorter duration, or with the profit or loss of the voyage, it is clear that nothing can fall to his charge *73 except the actual loss or damage to the ship and the expenses incurred for the purpose of preventing or repairing such loss. The master and crew are engaged by the ship owner, for the purpose of completing the object of the voyage, which is to earn freight; and the underwriter has a right to expect that the ship will be sufficiently manned for the purpose of being well conducted and taken care of. The owner, therefore, owes the service of the crew to the freighter and to the ship herself, during the whole voyage, and consequently during the time of repairs or detention, and he cannot call upon the underwriter for expenses occasioned by occurrences which are foreign to his contract.”
The force of these remarks is not diminished by the fact that in our country these expenses of wages and provisions constitute a subject for general average, and, as I conceive, must be allowed, even where the damage which made them necessary was fortuitous. But they are allowed only so long as they are necessary for the common benefit. They cease if the voyage is abandoned. The wages and medical bill amount to $411.50. The time of detention was from the 21st of February to the 10th of March, eighteen days. We are unable to say what amount should be allowed for wages in general average. We cannot find any ground upon which wages before the 21st of February, or after the 10th of March, could be allowed in particular average, and must reject the whole from this account. Nor can the hospital fees, $19, be allowed.
The item of $600.80, for stores to replace those totally destroyed, and to enable the vessel to proceed to Hong Kong, is one of difficulty.
If it is to be assumed that this amount was the value of provisions utterly lost by the stranding, then, as part of the ship, the insurable interest, they may be proper for particular average. (1 Arnould, 217, note ; 1 Phillips, 463.) What was actually destroyed may be allowed for.
In Brough v. Whitmore, (4 T. R., 206,) where provisions had been taken out of a vessel in order to facilitate the *74 repairs which were necessary, and were burnt in the store in which they were placed, the amount was recovered under a policy upon the ship. What was bought to replace such as were burnt, were paid for. Probably, also, stores consumed during the refitting, to enable the vessel to return to Hong Kong, should be allowed; but provisions for the return voyage cannot be. A very small amount deducted on this account will reduce the partial loss below the necessary sum. The two sums of $411.50, and $19, being deducted, the sum of $58 on this account will make the amount of partial loss below $1,000.
It was the duty of the assured, claiming a partial loss beyond the five per cent, to have made out his case distinctly. This they have not done. Nothing can be allowed on this ground.
As to the items of general average, the adjustment appears to be correct.
The freight has not been made to contribute. It was paid in advance.
Mr. Stevens considers that freight paid in advance does not contribute, and is not to be recovered back, although the voyage be defeated. Mr. Phillips, in his edition of Stevens and Benecke, (pp. 210-257, notes,) states this to be his understanding of the propositions of those learned writers. When prepaid freight is not to be recovered back, it is not to contribute. See also 2 Phil, on Ins, p. 139.
But the general rule of law undoubtedly is, that freight paid in advance may be recovered back, in the absence of any special agreement. (Phelps v. Williamson, 5 Sandf. S. C. R., 578 ; Ogden v. The N. Y. Mutual Ins. Co., 4 Bosw., 447 ; Hall v. Janson, 29 Eng. Law and Eq. R., 115,117.)
There is, however, this difficulty. The full freight was not earned, and there is no evidence that by acceptance of the goods any pro rata freight was earned. We cannot say that anything was saved, so as to create an obligation to contribute.
The decision will be that the verdict be reduced by deducting the sum allowed for particular average, and *75 judgment be entered for the plaintiff for the amount of the verdict so reduced, unless the plaintiff elect a reference to determine the amount to be deducted upon the principles of the opinion j in which case judgment is to he entered for the plaintiff for the amount of the verdict as the same shall he reduced upon such reference.
Bosworth, Ch. J., concurred in the result stated in the conclusion of the opinion of Hoeemah, J.
Ordered accordingly.